## THOMAS v. UNITED STATES.
### No. 9773.

Circuit Court of Appeals, Sixth Circuit.

Sept. 17, 1945.

16 Bruno v. United States, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257; McCandless v. United States, 298 U.S. 342, 347, 348, 56 S.Ct. 764, 80 L.Ed. 1205; Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548.

17 Little v. United States, 10 Cir., 73 F.2d 861, 866, 96 A.L.R. 889; Lynch v. Oregon Lumber Co., 9 Cir., 108 F.2d 283, 285, 286; Fort Dodge Hotel Co. v. Bartelt, 8 Cir., 119 F.2d 253, 259; Worcester v. Pure Torpedo Co., 7 Cir., 127 F.2d 945. 947, 948; Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412; Evansville Container Corporation v. McDonald, 6 Cir., 132 F.2d 80, 85.

Walter M. Nelson, of Detroit, Mich., for appellant.

Louis M. Hopping, of Detroit, Mich. (John C. Lehr and Louis M. Hopping, both of Detroit, Mich., and Victor C. Woerheide, Donald B. Anderson, and Edward S. Lazowska, all of Washington, D. C., on the brief), for appellee.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Appellant, and Theresa Behrens, Grace Buchanan-Dineen, Bertrand Stuart Hoffman, Carl John Wilhelm Leonhardt, Emma Elise Leonhardt, Walter Joseph Abt and Grafin Marianna Von Moltke, were indicted for a conspiracy to engage in the violation of § 32, Title 50, U. S. C. A.[1]

The indictment was based upon § 34 of Title 50,[2] and contained but one count. Upon arraignment appellant stood mute and a plea of "not guilty" was entered by the court. Six of the other defendants plead guilty and one, Hoffman, was discharged in the course of the trial.

After an extended trial the jury found appellant "guilty of the charges in the indictment" and the court imposed judgment.

In brief outline, there was testimony that in 1941, 1942 and 1943, appellant was a physician with offices in the Eaton Tower in Detroit. He was born in Fresno, Ohio, in 1898 and married there in 1926. He attended a university in Indiana and received his A. B. degree from Baldwin-Wallace School in 1921. He took post-graduate work at the University of Michigan and entered the Michigan Medical School from which he graduated in 1926. He did interne work at Grace Hospital, Detroit, Paterson General Hospital, Paterson, N. J., and Lenox Hill Hospital in New York City. He was exchange surgeon at St. George Hospital in Hamburg, Germany in 1928-9 and thereafter attended classes and visited other hospitals in Germany. Following completion of work in Berlin, he and his wife traveled through European countries; and returning to the United States he began medical practice in 1929.

In a statement made on August 27, 1943, to agents of the FBI, appellant said that he had known Theresa Behrens, a co-defendant, for eight or ten years. She was a secretary of the YWCA at the International Center in Detroit, and worked with, and rendered assistance to, persons of foreign extraction. Appellant met her when she referred a patient to an institution with which he was associated; and after that she herself became his patient.

Theresa Behrens was born in Hungary and came to the United States in 1913 but lived in Hungary in 1939, where she had known one Sari DeHajek and her husband, Gyula Rozinek. She met Grace Bu-

---

[1] "§ 32. Unlawfully disclosing information affecting national defense. Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years: * * *."

[2] "§ 34. Conspiracy to violate preceding sections. If two or more persons conspire to violate the provisions of sections 32 or 33 of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. Except as above provided conspiracies to commit offenses under this chapter shall be punished as provided by section 88 of Title 18."

chanan-Dineen, another co-defendant, through DeHajek and Rozinek.

Grace Dineen testified: that she was born in Canada, had traveled in Europe and had spent some time in Hungary, where she became acquainted with DeHajek and Rozinek and was asked by them in May of 1941 to become an espionage agent in America for the German government; that she made a trip to Berlin, where she received instructions in secret writing and other instructions as to traveling arrangements for her entry into the United States. On October 26, 1941, she took the Atlantic Clipper from Lisbon and arrived in New York on October 27th. Four days later she arrived in Detroit and telephoned Theresa Behrens, whom she had never met but whose name had been given her by De-Hajek, that she had news from DeHajek. They got together later the same day at the YWCA in Detroit.

Dineen testified that she told Behrens that she was a German espionage agent and that the latter agreed to help her. That afternoon Behrens took Dineen to appellant's office ostensibly for treatment of an infection. Although denied by both Behrens and appellant, Dineen testified that she was introduced to appellant as a secret agent of the German government and that he said he would be glad to help and inquired how he might help; to which she answered, that the German government wanted information about troop movements, defense plants, new drugs, figures on defense work, etc.

This meeting with Behrens and Dineen was the first of seven overt acts charged against appellant as furthering the conspiracy. The other six charged appellant with meetings with Dineen alone, at two of which it was averred that he supplied her with chemicals for making secret ink. It was also established, both by his testimony and that of Dineen, that there occurred a long series of meetings and conferences, thirty or more in number, between the two, which were not specifically charged in the indictment. At least three of these took place in Dineen's apartment. Many of these meetings, including five which were named as overt acts, occurred after March 5, 1942. On that date Dineen was arrested by the FBI and thereafter engaged in counter-espionage work for that agency.

Appellant's defense was that his relationship with Dineen was professional only; and he denied her testimony that he had given her information about American factories and production, about bomber transport, troop movements, etc. He testified that the tablets and alcohol (useful for secret writing) were prescribed for specific ailments of Dineen.

Note books and records taken from appellant's office by agents of the FBI after his arrest disclosed an interest in things German and in German-American societies prior to the entry of this country into the war. He admitted that he knew Theodore Donay, an importer in Detroit who was named as a co-conspirator in the indictment but was not indicted therein. He testified that he had, for several years, purchased various European specialties from Donay, that he knew in a professional capacity the Leonhardts who were co-defendants, and that he had seen and met Grafin Marianna Moltke, a co-defendant, prior to his arrest, but he denied that he ever conversed with her. He denied that he knew either Joseph Abt or Bertrand Hoffman, the other alleged co-conspirators, until after his arrest.

We have not set out the evidence exhaustively. In the aggregate we regard it as sufficient to take the case to the jury over appellant's motion for peremptory instructions. For present purposes this brief outline is sufficient to supply a background for understanding the challenged portions of the court's charge. There was no count in the indictment charging a violation of § 32, Title 50, U.S.C.A. Nevertheless, the court began the second paragraph of the charge in these words:

"*This Defendant,* one of the Defendants named in this indictment, *is upon trial for a violation of the so-called Espionage Act, Act 32,* Title 50 and the word 'espionage' means 'to espionage is to spy, the practice of spying on others, or the employment of spies, systematic, accurate observation of the words and conduct of others.' This statute is aimed to be punishment for espionage. * * *"  (Italics ours.)

Then followed this paragraph:

"*This indictment charges, based upon that section of the Criminal Code,* that this Defendant, Thomas, together, of course, as you have heard in the progress of the trial, Theresa Behrens, Grace Buchanan-Dineen, Bertrand Stuart Hoffman, Karl John Wilhelm Leonhardt, Emma Elise Leonhardt, Walter Joseph Abt, Frederick William Thomas and Grafin Marianna von Moltke, are the defendants charged, and *they are*

*charged with a violation of this* Act of Congress." (Italics ours.)

Then after a review of the evidence and after instructions as to the burden of proof and upon the subject of reasonable doubt, the court reiterated that appellant was charged with a violation of the Espionage Act and specifically excluded the charge of conspiracy, the only offense for which appellant was indicted, in the following words:

*"Now the claim is, the defendant isn't charged with a conspiracy \* \* \* he is charged with a violation of this so-called Espionage Act which I read to you, § 32. \* \* \*"* (Italics ours.)

The charge then discussed the Government's theory and epitomized it as follows: "The Government charges they prepared this plan to violate this Espionage Law."

■ It thus appears that up to this point the court had stated categorically, and had emphasized through repeated asseveration, that appellant was charged with a violation of a section of the Espionage Act. This was clear error. The sole crime ascribed to appellant in the indictment was that of conspiracy. These errors in the charge compel a reversal if it affirmatively appears that they affected some substantial right of the appellant. Title 28, § 391, U.S. C.A.; Simpson v. United States, 9 Cir., 289 F. 188, 191; Haywood v. United States, 7 Cir., 268 F. 795. It is well settled that appellant had a right to a correct statement of the law from the court. It is of course the duty of the court to explain the law of the case to the jury. Bird v. United States, 180 U.S. 356, 361, 21 S.Ct. 403, 45 L.Ed. 570.

At the point in the charge above indicated, counsel for the Government asked, "May counsel approach the bench, please?", to which the court responded "Yes." After an unreported colloquy between Government counsel and the court, out of the hearing of the jury, the court recessed. We can only surmise that counsel called the court's attention to the direct variance between the charge and the indictment, for, upon the jury's return, the court, resuming the instructions, stated significantly:

*"I wish to charge you now that I neglected to charge you upon the theory of conspiracy charged in this indictment. This indictment charges a conspiracy upon* the part of defendant Thomas to violate the so-called espionage statute and I will now proceed to charge you upon the question of conspiracy.

"In other words, it is charged in the indictment and the theory of the Government is that this defendant, along with all the other defendants, entered into a conspiracy to commit the crime against the United States, to wit, the violating of the provisions of § 32, which is known as the Espionage Act. Therefore, the statement which I have made as to the facts claimed for the Government is upon the theory, and the charge here is this defendant entered into a conspiracy to commit a crime against the United States as set forth in the indictment and it is based upon violation *as I said of § 32 of the statute."* (Italics ours.)

■ We think that this opening statement in the second instructions, far from curing the plain errors in the first, raised the implication that appellant was charged with the additional crime of conspiracy. In the instructions, given after the recess, we find no equivalent to an unqualified retraction of the fatal statement in the first charge that appellant was on trial for a violation of the Espionage Act, § 32, Title 50, U.S.C.A. The use of the word "neglected" in the above quoted clause leaves no other connotation than that the error the court had made was one of omission, that something had been overlooked and not that what had been said was wrong. Moreover, we think the clear error of the first instruction was accentuated by the following sentence in the second:

"So, as I have stated earlier in the charge, that it is the claim of the Government, when I said the facts claimed by the Government, without saying anything about the conspiracy or violations which the Government claims were committed, as to Section 32, unlawfully disclosed information affecting the national defense. The indictment charges a conspiracy to violate Section 32, and it has to have that intent or reason to believe that it is the object used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers or transmits, or attempts to, or aids or induces another to communicate, deliver or transmit to any foreign government or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, of-

ficer, agent, employee, subject or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance or information relating to the national defense, shall be guilty of the offense."

■■ The confusing nature of this excerpt did not serve to clarify the erroneous instructions theretofore given or in any wise to retract them; nor do we think that a subsequent statement of the court, to wit, "Of course you all have in mind the charge here is conspiracy" was a sufficient correction. The vice of the contradictory instructions was that they not only tended to confuse the jury as to the actual basis of the indictment, but to leave the wholly erroneous impression that Thomas was indicted for two offenses rather than one. This is the only reasonable conclusion that can be drawn from the jury's recorded verdict, to wit, that they "find the said defendant, Dr. Frederick William Thomas guilty of the *charges* in the indictment heretofore filed against him." (Italics ours.) This verdict was authenticated by the District Judge and must be taken as correctly recorded.

Appellant had a right for his own protection to know with certainty of the particular offense he had been found guilty. This was a substantial right and is inherent in our basic conception of criminal law and procedure. It is clear enough that this right was not safe-guarded by clear and specific instructions as to the offenses with which the appellant was charged.

■ The trial consumed a period of about five weeks and was hotly contested throughout. We cannot say that the evidence of appellant's guilt was so overwhelming as to render harmless the errors complained of.

■ Appellee contends that appellant's exception to the instructions were taken too late, since they were voiced after the retirement of the jury. The record shows that immediately after the jury was excused, presumably in the late afternoon, since the court spoke of making arrangements for them for the night, counsel for appellant inquired whether an opportunity was to be given for a statement of exceptions. Upon receiving an affirmative answer, counsel excepted in the following language:

"In two instances, the instruction was given that the defendant is charged with a violation of Sec. 32, Title 50 of the Act, and we claim in that respect that the later attempt to correct the charge is not sufficient and is confusing."

The record shows that the jury retired on Saturday and on the following Monday, a verdict not having been arrived at in the meantime, the court gave an additional instruction relative to "its deliberations in an endeavor to arrive at a verdict." Tuesday was a holiday (February 22) and on the next day the jury requested certain evidence to be read to it and the court made some further comment with respect to the district attorney's argument. The jury also requested that it be permitted to take the court's charge to the jury room, "to glance through it" but the charge had not been transcribed and the request could not therefore be granted.

Then followed a colloquy between the court and jury relative to the testimony of Mrs. Behrens after which the court asked if there was anything further. A juror answered, " * * * the question of the agreements" and another said, "Yes, from the law books," to which the court responded, without amplification or explanation of any sort, as above quoted, "Of course you all have in mind the charge here is conspiracy." After which observation the court re-read from an opinion of the Supreme Court a lengthy quotation touching the responsibility of an individual juror in trying to reach a verdict.

Thus, we see that on two occasions, subsequent to the exceptions taken by appellant's counsel, the court gave further instructions, and having had the exceptions before it for four days, overlooked the opportunity to clarify its charge on an issue obviously confusing to the jury, as indicated by the colloquy between the court and the jury above quoted.

We find it unnecessary to consider other exceptions taken during the progress of the trial.

We do not think that these matters complained of will arise at a second hearing, if the trial, including the taking of evidence and the argument of counsel, is conducted within the limited issue made by the one count indictment and the plea of not guilty.

For the reasons indicated, the judgment is reversed and the case remanded for a new trial.