**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Burnis BRYANT, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Henry Church BRYANT, Defendant-Appellant.**

**Nos. 71–1924, 71–1925.**

United States Court of Appeals, Sixth Circuit.

June 14, 1972.

Dale M. Quillen, Nashville, Tenn., (Court appointed), for defendants-appellants.

Fred D. Thompson, Asst. U. S. Atty., Nashville, Tenn., for plaintiff-appellee; Charles H. Anderson, U. S. Atty., M. D. Tennessee, on brief.

Before McCREE and MILLER, Circuit Judges, and ENGEL,* District Judge.

---

* The Honorable Albert J. Engel, United States District Judge for the Western District of Michigan, sitting by designation.

McCREE, Circuit Judge.

In number 71–1925, Henry Church Bryant appeals from a judgment after a jury conviction of three counts of carrying on the business of a retail dealer in liquors without paying the required federal tax, in violation of 26 U.S.C. § 5691(a), and of three counts of possessing, transferring, and selling distilled spirits the containers of which were not affixed with the tax stamps required by 26 U.S.C. § 5205(a)(2), in violation of 26 U.S.C. § 5604(a)(1). In number 71–1924, Burnis Bryant, Henry's brother, appeals from a judgment following a jury conviction of one count of aiding and abetting a violation of 26 U.S.C. § 5604(a)(1), in violation of 18 U.S.C. § 2. We affirm Henry Bryant's conviction but reverse that of Burnis Bryant.

At the consolidated trial, the testimony of agents of the Alcohol, Tobacco, and Firearms Division of the United States Department of the Treasury established the following facts. On November 7, 1969, one John Brown agreed to serve as a paid informer for the Government and to purchase non-tax-paid whiskey from Henry Bryant. Pursuant to this arrangement, on November 14, 1969, agent DeWitt Rollins gave Brown $14 to purchase whiskey, and Rollins positioned himself in a church outside Brown's apartment to permit him to observe the transaction. He saw Henry Bryant drive up, carry a heavy brown bag to someone inside, and receive money. Later that day, Brown delivered to Rollins a paper bag containing two gallons of non-tax-paid liquor. Essentially the same events occurred on November 20 and November 24, 1969. Additionally, during the November 20 delivery, Rollins observed that Burnis Bryant was driving the car in which Henry Bryant arrived at Brown's apartment. Henry was observed carrying a five-gallon jug into the apartment and coming out without it. The non-tax-stamped jug was later found to contain liquor. The car that Burnis was driving on that occasion was later seen at his residence, and he was arrested in that car on November 26.

At the close of the Government's case, Burnis Bryant moved for a judgment of acquittal on the two counts in which he had been charged with aiding and abetting violations of 26 U.S.C. §§ 5604(a)(1) and 5691(a) on November 20. This motion was denied. Counsel for Henry Bryant then moved that the Government be required to call Brown, the informer, as a witness. The court also denied this motion. Thereupon, counsel moved for permission to call Brown as a "hostile witness." The court reserved a ruling on this motion pending a demonstration that Brown was unfriendly, biased, or reluctant. Earlier, during a recess, at the direction of the court, defense counsel had been permitted to examine a statement that Brown had given to the Government and to interview Brown in the presence of the United States attorney. Thereafter, defense counsel called Brown as a witness for the defense since the court had not permitted the defense to treat him as a hostile witness. Nevertheless, defense counsel was allowed to question Brown with reference to a prior consistent statement, to impeach him by reference to his criminal record, to elicit the admission that he was a paid informer, and, to some extent, to ask leading questions. The United States attorney was permitted by the court, over objection of the defense, to ask Brown leading questions on cross-examination. Brown's testimony added nothing significant to the testimony already given by the federal agents.

The jury convicted Henry Bryant on all six counts. It acquitted Burnis Bryant on one count and, only after requesting and receiving a supplementary instruction, convicted him on the other count. Henry Bryant received concurrent sentences of two years on all counts, and Burnis Bryant received a sentence of 90 days on the one count of which he was convicted. Both appeal.

I

Henry Bryant contends that the refusal of the Government to call the informer as its witness violated his constitutional right to confront a witness against him, U.S.Const. amend. 6, and that the court erred in refusing to permit him to call the informer as a "hostile witness." We find no merit in these contentions.

The Sixth Amendment right of confrontation does not impose upon the Government the duty to call a particular witness. United States v. Polisi, 416 F.2d 573, 579 (2d Cir. 1969.) "Absent unusual circumstances such as knowingly concealing evidence favorable to a defendant, the Government has a wide discretion with respect to the witnesses to be called to prove its case. The government is not ordinarily compelled to call all witnesses competent to testify including special agents or informers." United States v. Mosby, 422 F.2d 72, 74 (8th Cir.), cert. denied, 399 U.S. 914, 90 S.Ct. 2217, 26 L.Ed.2d 571 (1970).[1] Nevertheless, there are situations when the Government, as a matter of due process, is required to call a witness who the Government has reason to believe will give exculpatory testimony. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Walton, 411 F.2d 283, 288 (9th Cir. 1969). This principle does not apply here.

Concerning Henry Bryant's second contention, we observe that, although Fed.R.Civ.P. 43(b) permits a party to "call an adverse party . . . and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party . . .," and that this right is separate from and in addition to the provision in Civil Rule 43(b) that a party placing a hostile witness on the stand may interrogate him by leading questions, see, e. g., Degelos v. Fidelity & Casualty Company of New York, 313 F.2d 809, 814–815 (5th Cir. 1963), there is no corresponding provision in the Federal Rules of Criminal Procedure. But, this does not end our inquiry: there remains the question whether the court abused its discretion in its ostensible refusal to allow the defense to treat Brown, admittedly not an adverse party, as a hostile witness. We hold that it did not.

There appear to be two views concerning the latitude to be afforded defense counsel in a criminal case in examining a witness whom he calls. What may be termed the orthodox view requires the defense, before impeachment or the use of leading questions is permitted, to establish to the satisfaction of the court in all cases that the witness is hostile. See United States v. Hicks, 420 F.2d 814, 815–816 (5th Cir. 1970); Guffey v. United States, 310 F.2d 753, 755 (10th Cir. 1962). This showing may be made on the basis of the in-court testimony of the witness, see, e.g., United States v. Hicks, supra, or the showing may be made on the basis of off-the-record, extrinsic facts that indicate, before the witness testifies, that the "witness' interest is on the side of the prosecution to such an extent that he is unlikely to give a true account of the transaction." Clingan v. United States, 400 F.2d 849, 851 (5th Cir. 1968). In Clingan, for example, the Fifth Circuit held that the trial court had abused its discretion in not permitting the defense to call an informer as a hostile witness when the informer had refused to discuss the case with defense counsel and had assisted the Government in numerous previous arrests on a contingent-fee basis. These circumstances presented a strong likelihood that the informer would not give a true account of the transaction.

The other and, we think, better view does not require a criminal defendant in

---

1. In the federal practice, unlike that of a few state jurisdictions, there is no rule requiring the prosecution to produce all known eye-witnesses to a crime. See, e. g., People v. Tann, 326 Mich. 361, 40 N.W.2d 184 (1949); 7. J. Wigmore, Evidence § 2079 (3d ed. 1940).

certain cases to show that a witness is "hostile." Instead, it focuses on the intrinsic nature of the relationship between the accused and the witness, and it dispenses with adherence to ritualistic requirements. Under this view, certain witnesses may be called by the defense and may be contradicted, asked leading questions, and impeached, without the necessity of a preliminary showing of hostility. The leading expression of this rule is that of Chief Judge Lumbard in United States v. Freeman, 302 F.2d 347, 351 (2d Cir. 1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963):

> When a defendant calls government agents to the stand in an effort to establish some part of his defense he should be given every reasonable leeway in bringing out whatever may be relevant to the issues before the jury. It is pointless to require a showing, such as the trial judge indicated might be necessary, that such witnesses are hostile.

> The agents were adverse parties within the meaning of Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C., which permits such witnesses to be cross-examined, asking leading questions, and generally impeached. Although there is no companion provision in the Federal Rules of Criminal Procedure, there is even more reason for permitting such a practice in criminal cases where every proper means of ascertaining the truth should be placed at the defendant's disposal.

> We do not limit our repudiation of the pernicious rule against impeachment of one's witness to instances in which the witness is an "adverse party" or "hostile." The search for truth is not to be confined by any such limitation, and, as Professor Morgan has aptly said:

> > "The fact is that the general prohibition, if it ever had any basis in reason, has no place in any rational system of investigation in modern

society and all attempts to modify or qualify it so as to reach sensible results serves only to demonstrate its irrationality and to increase the uncertainties of litigation." I Morgan, Basic Problems of Evidence, page 64 (1954 Ed.).

See also the classic discussion by Dean Wigmore at 3 Wigmore on Evidence §§ 896–899 (3d Ed. 1940).

*See also* United States v. Lineberger, 444 F.2d 122 (4th Cir. 1971); United States v. Stamps, 430 F.2d 33, 37–38 (5th Cir. 1970) (Simpson, J., dissenting); United States v. Fancher, 319 F.2d 604, 605 (2d Cir. 1963); Johnson v. Baltimore & Ohio Railway Company, 208 F.2d 633, 634–636 (3d Cir. 1953), cert. denied, 347 U.S. 943, 74 S.Ct. 639, 98 L.Ed. 1091 (1954).

It will be observed that the court in *Freeman* actually was concerned with two separate but related principles. The first is the rule requiring the defendant in a criminal case to make a showing of hostility of a witness whom he calls before being permitted to lead him or otherwise utilize techniques ordinarily permissible only on cross-examination. This rule was rejected by the court to the extent that it related to a Government agent, whose interests the court held could safely be assumed to be adverse to those of the defendant. The second is the long-established, and frequently criticized, rule against a party's impeaching his own witness. This rule was emphatically rejected by the Second Circuit with respect to *any* witness, no matter by whom he might be called. Implicit in this distinction enunciated by the Second Circuit is, of course, the recognition that there exist sound reasons for maintaining control of the use of leading questions and of the other techniques of cross-examination, and that restrictions on the utilization of these devices result from considerations fundamentally distinguishable from those upon which courts have traditionally relied to justify the rule against impeaching one's own witness. We agree.

The two major policy considerations that have been advanced to justify the rule against a party's impeaching his own witness—a party vouches for his witness' credibility, and a party should not have the means to coerce his witness' testimony—have been thoroughly discredited elsewhere,[2] and it would serve no useful purpose to catalogue the arguments against the rule here. Nevertheless, it is important to observe that the rule depends not upon whether the witness is friendly or hostile but rather upon whether the party has so dealt with the witness as to "make the witness his own." 3A J. Wigmore, Evidence § 909, at 699 (Chadbourn rev. 1970). The prohibition against leading questions, on the other hand, depends completely on the

> presumed mental condition of the witness. The object of the rule is to prevent the supplying of suggestions of false testimony to a witness who is disposed to take advantage of them (§ 769 *supra*). He is assumed to be friendly to the party putting him on the stand; but this is only a provisional assumption; and, accordingly, if he turns out to be hostile to that party, the prohibition ceases (§ 774 *supra*), and, conversely, if on cross-examination by the other party, to whom he has been assumed to be hostile, he turns out to be a friendly partisan, the prohibition applies equally on cross-examination (§ 773 *supra*). Thus the test for the prohibition of leading questions is ultimately and essentially independent of the superficial circumstance whether originally one party or the other put him on the stand.

*Id.*

■ We find the reasons urged for the first rule unconvincing and we therefore reject as unsound and illogical the rule that prohibits a party from impeaching a witness whom he calls. In doing so, we join a number of other circuits that have come to the same conclusion, *see* United States v. Lineberger, *supra*; United States v. Freeman, *supra*; Johnson v. Baltimore & Ohio Railway Company, *supra*; as have most commentators, *see* 3A J. Wigmore, *supra*, §§ 898–899 (Chadbourn rev. 1970); C. McCormick, Handbook of the Law of Evidence § 38, at 73 (1954); E. Morgan, Basic Problems of Evidence 70–71 (1962); J. Tracy, Handbook of the Law of Evidence 193 (1952); J. Maguire, Evidence—Common Sense and Common Law 43 (1947); Ladd, Impeachment of One's Own Witness—New Developments, 4 U.Chi.L.Rev. 69, 76–88 (1936). The major uniform-rules proposals have also rejected the rule. *See* Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Rules of Evidence for the United States Courts and Magistrates rule 607 (rev.draft 1971), in 51 F.R.D. 315, 388 (1971); Uniform Rules of Evidence rule 20; Model Code of Evidence rule 106 (1942).

■ However, there exist sound reasons for requiring a showing of hostility as a prerequisite to permitting the utilization of leading questions on direct examination except with respect to preliminary and uncontroverted matters. The vice of the leading question lies in its suggestion of an answer to a witness who, having been called by the party, is presumed to be inclined to favor the questioner. If counsel were allowed routinely to lead a witness on direct examination, the evidence elicited would all too often be that of the lawyer, not of the witness. *See* J. Maguire, *supra*, at 44.

■ This risk is not present when the defense is permitted to ask leading questions of a Government agent or of another witness closely identified with

---

2. *See* Johnson v. B & O. R. Co., 208 F.2d 633, 634–636 (3d Cir. 1953), cert. denied, 347 U.S. 943, 74 S.Ct. 639, 98 L.Ed. 1091 (1954); 3A J. Wigmore, Evidence §§ 896–906 (Chadbourn rev. 1970); Ladd, Impeachment of One's Own Witness—New Developments, 4 U.Chi.L.Rev. 69 (1936).

the interest of the Government (*e.g.*, the complaining witness). It is realistic to assume, in such a case, that the witness will not be predisposed to accept suggestions offered by defense counsel's questions. Such a witness, like the "adverse party" to which Fed.R.Civ.P. 43(b) refers, is not likely to be tractable on direct examination by defense counsel. Accordingly, defense counsel should be permitted to lead such a witness unless the Government establishes that the witness is not hostile or biased against the defense. *See* 3 J. Wigmore, *supra*, § 774; *cf.* Proposed Rules of Evidence for the United States Courts and Magistrates, *supra*, rule 611(c), 51 F.R.D. at 395.

 Applying this rule to the facts of this case, we find no error in the District Court's refusal to permit defense counsel to call Brown as a "hostile witness." Brown was not a Government agent. He was an informer, and his reliability was uncertain. He had sold his services, but his allegiance at trial may not have been included in the bargain. Defense counsel was therefore properly required to make a showing of hostility, which he was unable to do. Indeed, in this case, as contrasted to *Clingan, supra*, defense counsel did speak with Brown before the latter testified and received at this point a copy of the statement Brown had given to the Government, which gave counsel a benefit beyond that required by the Jencks Act, 18 U.S.C. § 3500.[3] There was no showing prior to Brown's testimony that he had participated in other arrests or that he had been operating on a contingent-fee basis. There was no reason to assume that Brown would have been a hostile or unwilling witness, and in fact he was not.

Moreover, despite the court's formal ruling on the defense motion, defense counsel was afforded great latitude in his examination of Brown. Counsel was permitted to impeach Brown and lead him to some extent and was able to elicit statements that might have been construed by the jury, which was charged on the law of entrapment, as a basis for determining that Henry Bryant had been entrapped. The amount of Brown's fee was also brought out, as it had been during the Government's presentation of its case. Brown's testimony corroborated in all significant respects that of the federal agents. In these circumstances, we find no reversible error in the court's ruling on the defense motion. *See* United States v. Lineberger, *supra*; United States v. Freeman, *supra*, 302 F.2d at 352.

## II

Burnis Bryant contends that the court erred in denying his motion for judgment of acquittal at the close of the Government's case and in delivering a "grossly inadequate" charge to the jury on th law concerning aiding and abetting.

Burnis Bryant's first contention requires us to determine whether, viewing the evidence and the inferences that may be drawn therefrom in the light most favorable to the Government, there was enough evidence from which the jury could have found the defendant guilty beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941); United States v. Decker, 304 F.3d 702, 705 (6th Cir. 1962). We conclude that there was.

 The applicable standard on aiding and abetting is the oft-quoted statement of Judge Learned Hand that it is necessary that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938). *See* Nye & Nissen v. United States, 336 U.S. 613,

3. The Jencks Act, 18 U.S.C. § 3500(a), provides that a statement of a prospective Government witness shall not be discoverable by the defense until that witness has testified on direct examination.

619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Bradley, 421 F.2d 924 (6th Cir. 1970). The defendant must act or fail to act with the specific intent to facilitate the commission of a crime by another. *See* United States v. Dallas, 418 F.2d 221, 222 (6th Cir. 1969) (per curiam); Hernandez v. United States, 300 F.2d 114, 123 (9th Cir. 1962). "But knowledge that a crime is being committed, even when coupled with presence at the scene, is generally not enough to constitute aiding and abetting." United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962). *See* Hendrix v. United States, 327 F.2d 971, 973–974 (5th Cir. 1964); Morei v. United States, 127 F.2d 827, 830–831, 835–836 (6th Cir. 1942).

██ In this case, the jury would have been justified in inferring that Burnis Bryant intended to facilitate his brother's violation of the federal liquor tax laws from the following facts: the blood relationship between the two men; Burnis' operating the car in which his brother transported a five-gallon whiskey container; and the delivery of the container to the back door of Brown's apartment. This evidence, upon a proper instruction to the jury, would have warranted a finding that Burnis Bryant knew what his brother was doing and intended by his actions to make his brother's illegal venture succeed.

However, we agree with appellant that the jury instruction on aiding and abetting was "grossly inadequate." The court charged the jury merely that "the aiding and abetting statute . . . provides in substance that if anyone aids or abets another in the commission of an offense that he is punishable as a principal also. That is what aiding and abetting statute is." This instruction failed to advise the jury of the elements of the crime; it failed to tell the jury that it could convict only upon finding that appellant had a specific criminal intent. The instruction was deficient.

██ We have consistently held that it is the duty of the trial judge "to tell a jury what facts they must find before they can convict—that is, to instruct the jury as to the elements of the crime charged." United States v. Rybicki, 403 F.2d 599, 602 (6th Cir. 1968); Thomas v. United States, 151 F.2d 183, 186 (6th Cir. 1945). *See* 2 C. Wright, Federal Practice & Procedure (Criminal) § 487, at 300 (1969). Ordinarily, it will not suffice merely to read to the jury the statute defining the crime. Even though the language of a statute may expressly contain all the elements of the offense, common English words often will have peculiar legal significance. *Cf.* Wheeler v. United States, 89 U.S. App.D.C. 143, 190 F.2d 663 (1951). And, some jurors may not be conversant with the common English meaning of common English words. Would a juror, for example, think that "abet" is merely a synonym for "aid" and thus a redundancy, or would he know that it means "to incite, encourage, instigate, or countenance . . . [;] to assist or support in the achievement of a purpose . . . "? Webster's Third New International Dictionary 3 (1961).

██ As we have stated above, specific criminal intent is an element of the offense of aiding and abetting, and "[w]here intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." Morissette v. United States, 342 U.S. 246, 274, 72 S. Ct. 240, 255, 9 L.Ed. 288 (1952). Many criminal statutes expressly include the requirement that the accused specifically intend to have performed a particular criminal act. *See, e. g.,* 18 U.S.C. § 2114. Many others, however, such as the aiding and abetting statute, do not, even though specific intent is an element of the offense. In either case, the jury must be charged fully and accurately on intent. *See* Morissette v. United States, *supra*; United States v. Bryant, 137 U. S.App.D.C. 124, 420 F.2d 1327, 1333 (1969); Bradley v. United States, 136 U.S.App.D.C. 339, 420 F.2d 181, 188 (1969); Findley v. United States, 362 F.2d 921 (10th Cir. 1966); Jackson

v. United States, 121 U.S.App.D.C. 160, 348 F.2d 772 (1965); 2 C. Wright, *supra*, § 487, at 302. Intent, like willfulness or premeditation, is a subjective element the existence of which usually must be inferred from evidence of overt acts, but if the jury is not instructed that intent must be found to have existed, the danger is great that a conviction may result on the basis of overt acts alone. This case provides a classic example: it is undisputed that Burnis Bryant was driving the car in which the principal was transported to the scene of the crime, but it does not necessarily follow that he specifically intended to facilitate the performance of an act forbidden by law. The jury may have convicted on the basis of mere presence, without having made the inference of criminal intent. *Cf.* Morei v. United States, *supra*, 127 F.2d at 836. The possibility that substantial prejudice resulted to appellant from the court's omission of an instruction on intent is sufficient to require reversal. *See* United States v. Rybicki, *supra*, 403 F.2d at 604; Jackson v. United States, *supra*.

■ Our conclusion is not affected by the fact that no request for an instruction on aiding and abetting was made by appellant, nor objection made to the court's charge. With respect to the former, "[i]t is a grave error to submit the case without accurately defining the offense charged and its elements. Such an error is not excused or waived by failure to request a proper instruction." 2 C. Wright, *supra*, § 487, at 300; United States v. Rybicki, *supra*, 403 F.2d at 602. Nevertheless, the failure to object restricts our review to a determination whether the omission was "plain error" that affected "substantial rights" of the accused. Fed.R.Crim.P. 52(b). *See* Smith v. United States, 230 F.2d 935, 939 (6th Cir. 1956). We must affirm "unless the court's charge was so lacking in explanation of the offenses charged and their elements as to be fundamentally erroneous and inadequate." United

States v. Ramsey, 291 F.2d 737, 739 (6th Cir.), cert. denied, 368 U.S. 899, 82 S.Ct. 177, 7 L.Ed.2d 94 (1961). Although the failure to instruct concerning all the elements of the crime does not *per se* require reversal, we reverse if the circumstances of the case indicate that the "omission was not merely a technical procedural fault but could have visited substantial prejudice on [the defendant]." United States v. Rybicki, *supra*; 403 F.2d at 602, 604. We conclude that the failure to instruct on intent in this case constitutes plain error and requires reversal. 2 C. Wright, *supra*, § 487, at 302; *see* Findley v. United States, *supra*, 362 F.2d at 922–923; United States v. Byrd, 352 F.2d 570, 572–574 (2d Cir. 1965).

We are not here concerned with an omission that constitutes a mere technical defect or with one that concerns the existence of an element that has been conceded by the defense or is otherwise not in issue. Instead, the omission in this case concerned the element that constitutes the very basis of the offense and the only element in issue. The physical facts were uncontroverted; appellant did not take the stand to deny that he had driven his brother to Brown's apartment. The only question for the jury was whether proof of these facts was sufficient to establish beyond a reasonable doubt that appellant consciously associated himself with his brother's venture, that he sought to make it succeed. United States v. Peoni, *supra*. The jury was not told, however, that this was the question with which it was confronted, nor that "[m]ere presence at the scene of the crime and guilty knowledge of the crime, however, are not sufficient to establish aiding and abetting unless you are convinced beyond a reasonable doubt that the defendant was a participant rather than merely a knowing spectator." Pinkney v. United States, 380 F.2d 882, 886 (5th Cir. 1967), cert. denied, 390 U. S. 908, 88 S.Ct. 831, 19 L.Ed.2d 876 (1968). In fact, the jury was not even

read the entire statute, which does include words such as "counsels" and "commands," from which the jury might have inferred the requirement of the element of intent.

Further, the jury acquitted Burnis Bryant on the count that charged aiding and abetting the carrying on of a business of retail liquor dealer without paying the required federal tax. This suggests that the jury was at least uncertain about the extent of Burnis' knowledge of and participation in his brother's illegal activities. Moreover, the jury did not convict Burnis Bryant on the other count until it had requested a supplementary charge whether the averment that he aided and abetted the "possession, transfer, and sale" of non-tax-paid whiskey was to be understood conjunctively or disjunctively. The jury foreman advised the court that "we've been discussing this one particular item the biggest part of the time we've been in there." The court instructed the jury that it could find appellant guilty of aiding and abetting either the possession or the transfer or the sale of the liquor, even though the indictment charged in the conjunctive. Significantly, again, the court failed to instruct on the requirement of intent. Shortly thereafter, the jury returned its verdict of guilty. The jury may have decided that appellant aided and abetted the possession or transfer of illegal liquor merely because Burnis was present when the whiskey was delivered or because his car was used in its delivery.

These circumstances indicate that substantial prejudice may have resulted to the rights of appellant. There is no reasonable assurance that the jury did not speculate about the extent of Burnis' responsibility for the actions of his brother. Accordingly, because of the failure to charge concerning the element of specific intent, Burnis' conviction must fall.

In number 71–1925, the conviction is affirmed. In number 71–1924, the conviction is reversed and the cause remanded for a new trial.