**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0205n.06
Filed: March 28, 2006

**No(s) 04-3633/3722**

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| GEORGE T. KATURAMU; TWINE B. | ) | DISTRICT OF OHIO |
| KATURAMU, | ) | |
| | ) | **O P I N I O N** |
| *Defendants-Appellants*. | ) | |
| | ) | |

**BEFORE:** **COLE, GIBBONS,** and **ROGERS, Circuit Judges.**

**R. GUY COLE, JR., Circuit Judge.** Appellants George Katuramu and Twine Katuramu are Ugandan nationals who in January of 2004 were each convicted of various federal offenses arising from a series of financial scams.

George Katuramu appeals his nine-count conviction for conspiracy, mail fraud, passing counterfeit bills, four counts of bank fraud, and two counts of forged securities. George also appeals his sentence, consisting of 35 months of imprisonment, three years of supervised release, a $900 special assessment, and $154,063.76 in restitution, which the district court imposed prior to *United States v. Booker*, 543 U.S. 220 (2005). George completed his 35-month sentence of imprisonment while this appeal was pending, and his counsel represents that he is currently in federal custody awaiting Department of Homeland Security proceedings.

Twine Katuramu appeals his four-count conviction for conspiracy, mail fraud, and two counts of bank fraud. Twine also appeals his sentence, consisting of 37 months of imprisonment, three years of supervised release, a $400 special assessment, and $8,734.04 in restitution, also imposed prior to *Booker*. Twine is scheduled to be released from prison on March 31, 2006.

Appellants appeal their convictions on the grounds that the government improperly exercised a peremptory challenge to strike a black juror in violation of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), and that the trial court gave an improper jury instruction regarding the bank fraud and mail fraud charges. In addition, George challenges the sufficiency of the evidence supporting his counterfeiting conviction. Appellants also request resentencing in light of *Booker*.

We affirm the convictions of each defendant, vacate in part each defendant's sentence, and remand both matters for resentencing.

## I. *Batson* claim

A peremptory challenge that is exercised on account of a potential juror's race violates the Equal Protection Clause of the Fourteenth Amendment, *Batson*, 476 U.S. at 89, and Due Process Clause of the Fifth Amendment, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). To establish a *Batson* violation, a defendant must first make out a prima facie case of racial discrimination either by demonstrating an extended pattern of discrimination over many cases or by the "totality of the relevant facts" concerning a prosecutor's conduct during the defendant's own trial. *Miller-El v. Dretke*, __ U.S. __, 125 S. Ct. 2317, 2324 (2005) (quoting *Batson*, 476 U.S. at 96). If this first step is met, the burden shifts to the prosecutor to articulate a race-neutral explanation for exercising the challenge. *Id.* This second step "does not

demand an explanation that is persuasive, or even plausible," but merely a reason that is facially

nondiscriminatory. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Third, and finally, the trial court

then must determine whether the defendant has proven purposeful discrimination. *Miller-El*, 125

S. Ct. at 2325. Purposeful discrimination may be shown by demonstrating that the proffered

explanation is merely a pretext for a racial motivation. *United States v. Jackson*, 347 F.3d 598, 604

(6th Cir. 2003). The ultimate burden of persuasion always rests with the party challenging the strike

to prove that it was motivated by discriminatory animus. *Id.*

At the defendants' trial, the government exercised a peremptory challenge to strike Keisha

Smith, one of two black venirepersons in the jury pool. The defendants immediately raised a *Batson*

challenge. In response to the defendant's objections, the government stated that the "totality of the

circumstances" led to the decision to strike Smith. The government cited information provided on

Smith's jury questionnaire, indicating her and her husband's history of low-level employment, her

lack of higher education, her apparent parenting of children with three different men (an inference

made by the prosecution based on Smith listing children with three different last names), and the fact

that she rented and did not own her home (which the prosecution argued "goes to the issue of

investment into the community"). The government also cited Smith's testimony in voir dire

regarding her cousin's criminal history. The defendants did not contest the government's reasons

or argue that the government's reasons were pretextual. The trial court found that the government

had stated a race-neutral reason for striking Smith and denied the defendants' *Batson* challenge.

On appeal the defendants argue that the district court erred in finding the government's

articulated reasons to be race-neutral and in finding that the defendants had not proven purposeful

discrimination. "A district court's ruling on whether the exercise of a peremptory challenge violates equal protection is entitled to great deference and will not be reversed unless it is clearly erroneous." *Jackson*, 347 F.3d at 604.

We conclude that the district court did not commit clear error in denying the defendants' *Batson* challenge. The district court correctly concluded that the government's articulated reasons for striking Smith were facially neutral. The defendants argue that the government's reasons reflect facial *economic* discrimination, but they cite no authority to support expanding *Batson* to prohibit exercising peremptory strikes based on financial factors.

To be sure, social or economic factors may represent mere pretexts for impermissible racial, ethnic, or sex-based discrimination. But the defendants also have not demonstrated that the government's reasons for striking Smith were pretextual. The defendants rely upon *Miller-El v. Dretke,* 125 S. Ct. at 2325, where the Court recognized that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." Such a "comparative juror analysis," *see id.*, is of no benefit to defendants here, where there is no evidence demonstrating that white jurors possessed the same characteristics for which Smith was allegedly stricken.

The defendants incorrectly suggest that the prosecutor showed more concern for Smith's minor connection to the criminal justice system – namely, a cousin with whom she rarely spoke who had been incarcerated – than the more significant connections that some white jurors acknowledged. In fact, the record shows that every white person who had a criminal history, had a relative with a

criminal history, or had been a victim of a crime, had already been stricken by either the government or defense counsel by the time the government exercised its challenge to strike Smith. The government exercised two peremptory challenges to strike white jurors with a connection to the criminal justice system: one who had served time for a drunk-driving conviction, and another whose brother had a prior conviction. The only juror with any past connection to the criminal justice system who was not stricken either for cause or by peremptory challenge was Cynthia White, a black woman who ultimately sat on the jury and whose son was currently serving time in jail.

The record is silent as to the jury questionnaires that reported each venireperson's educational background, employment history, and homeowner status, factors which the government claimed formed other bases for striking Smith. It is similarly silent as to whether other jurors supplied information about their children or marital history that could support the same inference of "instability" which the government drew from Smith's answers. Absent evidence that the government's articulated reasons for striking Smith applied equally to impaneled white jurors, the *Miller-El* rule simply has no application.

The defendants argue that *Miller-El* places a burden on the district court not to accept without question the government's claim of lack of pretext.[1] In *Miller-El,* the Court rejected the district court's finding that the government's stated race-neutral reasons were "completely credible

---

[1] In their reply brief and throughout oral argument, the defendants also relied upon *Johnson v. California*, 125 S. Ct. 2410 (2005), which was decided on the same day as *Miller-El*. *Johnson* deals with the level of the burden defense counsel must overcome to satisfy the prima facie prong, the first prong of the *Batson* burden-shifting framework, which in turn triggers the trial judge's obligation to seek a race-neutral explanation from the prosecutor. *Id.* at 2416. The prima facie prong is not at issue in this case, and *Johnson* is not on point.

[and] sufficient," *see* 125 S. Ct. at 2323, because the record contained ample evidence of purposeful discrimination, including the sheer number of black venirepersons that were stricken, *id.* at 2325, the side-by-side comparisons of stricken black venirepersons and white jurors discussed above, *id.* at 2325-32, the prosecutor's resort to a "jury shuffle" to change the order of the venirepersons, *id.* at 2332-33, the disparate questioning techniques employed to vet black versus nonblack venirepersons, some of which the Court characterized as "trickery," *id.* at 2333-38, and even evidence "beyond the case at hand," *id.* at 2325, including a history of discrimination practiced by prosecutors in the county where the trial was held, *id.* at 2338-39. Indeed, the *Miller-El* Court reminded trial courts of their responsibility to "assess the plausibility of [a prosecutor's stated] reason in light of all evidence with a bearing on it." *Id.* at 2332. But while *Miller-El* calls upon courts to perform a searching review of all the available evidence, it says nothing of a trial court's responsibility to adduce evidence when the challenging party fails to do so.

Here, the defendants would have us infer pretext from an *absence* of evidence. For example, the defendants emphasize the fact that no voir dire was conducted of Smith concerning many of the allegedly problematic factors, including her children's parentage, her low-paying job, and her status as a renter; but, since the defendants never challenged these articulated reasons as pretextual, the record contains no response from the prosecutor as to why he failed to conduct this questioning or why he felt these factors mattered. In *Miller-El*, the absence of follow-up questioning on an allegedly important factor, namely the venireperson's level of support for the death penalty, was one of numerous facts demonstrating that the prosecutor's articulated reasons were not credible. *See id.* at 2327. *Miller-El* is clearly factually inapposite, and the government's failure to question Smith

about her socioeconomic status or her children's parentage does not alone support an inference of purposeful discrimination.

Finally, we note that the district court's determination of pretext must be made by reference to all the pertinent circumstances, "including the final make-up of the jury," *United States v. Beverly*, 369 F.3d 516, 527 (6th Cir. 2004). Here, 50% of the eligible black venirepersons (that is, one out of two) were ultimately seated on the jury.

The record simply does not support a conclusion that the district court committed clear error in finding no discrimination. We therefore affirm the district court's denial of the defendants' *Batson* claim.

## II. Insufficiency-of-Evidence Claim

George argues that his conviction for passing counterfeit bills is not supported by substantial evidence. When reviewing an insufficiency-of-the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). George has not overcome this deferential standard.

Numerous counterfeit $50 bills were found in the tills of several business establishments in the Lima, Ohio area in the fall of 2002. George argues that insufficient evidence existed to identify him as the individual who was paying with the counterfeit bills. This argument is unpersuasive. The record includes testimony from numerous witnesses identifying George as the person passing counterfeit money, either through direct eyewitness testimony or obvious circumstantial inference. For example, Lance Oleviri, a convenience store employee, testified that he remembered George

paying for merchandise with an odd-looking $50 bill on the evening before counterfeit $50 bills were found in the store till. Stacy Johnson, another employee of the same store, testified that she remembered George attempting to pay with a $50 bill that "didn't look right" on the very next day, which "looked like" the counterfeit bills that had been found in the store safe. Jung Owehta, an employee of another store, remembered George paying for merchandise with a $50 bill around the time that counterfeit bills were discovered in the store's bank deposit, although she could not provide details about the transaction, and her testimony about the time frame of the transaction appears to be inconsistent with other witnesses. Randy Thatcher, the director of a pharmacy in Lima, testified that one of his employees told him that George had attempted to pay with a counterfeit $50 bill; while it does not appear that Thatcher actually witnessed George attempting to pay with the counterfeit bill, Thatcher testified that he examined the counterfeit bill in question and that he detained George at the store while awaiting local law enforcement, who took George into custody.

The direct evidence provided by these witnesses' testimony is sufficient for a reasonable jury to conclude that George passed counterfeit bills. Additionally, circumstantial evidence alone can satisfy this court's standard of review for sufficiency of evidence to support a conviction, and the evidence need not remove every hypothesis except that of guilt. *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994). Although these witnesses may have had various levels of credibility, and although their testimony demonstrates varying degrees of detail, first-hand knowledge, and consistency, this court "do[es] not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury" in evaluating the sufficiency of evidence supporting a

conviction. *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (quoting *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994)).

George also argues that there was insufficient evidence of *mens rea*. George correctly asserts that the crime with which he was charged requires him to have an intent to defraud. *See* 18 U.S.C. § 472. He argues that none of the witnesses could offer evidence that he knew any of his money was counterfeit. We reject this argument as well. The record contains testimony describing George's repeated attempts to pass counterfeit $50 bills. It is also obvious that at least one of these attempts, namely, the incident at the pharmacy leading to his arrest, occurred after he had been explicitly warned by a convenience store employee that he was in possession of counterfeit money. Based on this evidence, the jury could have easily inferred that George had knowledge of the counterfeit nature of the money when he used it to complete transactions. Such circumstantial evidence is sufficient to support the jury conviction. *See Peter*s, 15 F.3d at 544.

### III. Improper Jury Instruction Claim

The defendants also find fault with the jury instruction given for the charges under 18 U.S.C. § 2, the aiding and abetting statute. Since the defendants did not object to the jury charge at trial, we review for plain error. *United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004). Plain error is a stringent standard that requires the court to determine whether "the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *United States v. Wood*, 364 F.3d 704, 708 (6th Cir. 2004) (quoting *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992)). To establish plain error, a defendant must show that an error occurred in the district court that was obvious, that affected the defendant's substantial rights, and the adverse impact of which

seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997). The defendants cannot meet any prong of this test.

First, the district court's instruction was not in error. A district court commits plain error by failing to instruct the jury on the element of intent for aiding and abetting. *United States v. Bryant*, 461 F.2d 912, 920-21 (6th Cir. 1972). Such a failure occurs when the court "charge[s] the jury merely that 'the aiding and abetting statute . . . provides in substance that if anyone aids or abets another in the commission of an offense that he is punishable as a principal also.'" *Id.* In contrast, the following instruction on intent under the aiding and abetting statute survived plain error review:

> In order to aid and abet another to commit a crime it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say, that he willfully seek by some act or omission of his to make the criminal venture succeed.

*United States v. Thomas*, 11 F.3d 620, 631 (6th Cir. 1993).

Here, as in *Thomas*, the district court gave a detailed explanation of the meaning of aiding and abetting, as contrasted with the tautology that was found to be problematic in *Bryant*. In fact, the district court's instructions were a verbatim recitation of the aiding and abetting statute and the relevant Sixth Circuit Pattern Jury Instruction regarding aiding and abetting. Specifically, the instruction included the following:

> Before any Defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.
>
> ***

- 10 -

> Proof that a defendant may have known about the crimes, even if he was there as the crimes were being committed, is not enough for you to find him guilty. You can consider this in deciding whether the government has proved that he was an aider and abetter, but without more, it's not enough.
>
> What the government must prove is that the defendant did something to help the crime with the intent that the crime be committed.

*Compare with* Sixth Circuit Pattern Jury Instruction § 4.01. These instructions are substantially similar in content to those upheld in *Thomas*. Furthermore, this court has routinely found that instructions are not plainly erroneous where they track the circuit's pattern jury instructions, including cases that explicitly examine the aiding and abetting pattern instructions. *E.g., United States v. Hines*, 398 F.3d 713, 718 (6th Cir. 2005) (pattern conspiracy instruction); *United States v. Haynes*, 98 F. App'x 499, 504 (6th Cir. 2004) (unpublished) (aiding and abetting instruction), *vacated on other grounds* 543 U.S. 1112 (2005); *United States v. Shabazz*, 98 F. App'x 408, 409 (6th Cir. 2004) (unpublished) (deliberate ignorance instruction); *United States v. Tiller*, No. 99-3851, 2000 WL 1888796, at *2 (6th Cir. Dec. 22, 2000) (unpublished) (aiding and abetting instruction).

Immediately prior to giving the jury the charge on aiding and abetting, the district court gave a detailed instruction on the elements of the substantive charges of bank fraud and mail fraud. In the bank fraud instruction, the court defined in great detail "intent to defraud," an element of the offense. In its mail fraud instruction, the court referred back to the "intent to defraud" definition given in the bank fraud instruction. In short, the district court committed "no error, plain or otherwise," in giving its jury instructions. *Tiller*, 2000 WL 1888796, at *2.

Second, even if the defendants could demonstrate error, they would fail the plain error test, because the overwhelming evidence of their guilt demonstrates that any error in the jury instructions did not affect the "substantial rights of the accused" or "fairness, integrity or public reputation of judicial proceedings." *See Hines*, 398 F.3d at 718-19. The defendants stress the fact that they were not found guilty of every count of aiding and abetting, suggesting that the jury had some doubts about the defendants' guilt under the aiding and abetting charge. The aiding and abetting charges for which the defendants were found guilty involved a scheme in which the defendants fraudulently represented to Chase Manhattan Bank that they were acting as agents for MetLife, and another scheme in which the defendants fraudulently represented to Bank of America that they were acting as agents for the American Chemical Society. The count upon which the jury returned a not guilty verdict involved the defendants representing to the Royal Bank of Canada that they were acting as agents for the Province of New Brunswick. The jury heard different testimony and examined different exhibits in relation to each of these charges. There is no reason to attribute an acquittal on one charge and conviction on two others to jury confusion over the aiding and abetting instructions.

Twine argues that the jury could have interpreted many of his actions – such as opening a new bank account in which to deposit funds, sending Federal Express packages, and depositing checks into accounts – as innocent favors performed at "the behest of his brother." Twine presented this version of events in his testimony at trial. His testimony consisted primarily of describing his willingness to perform peculiar financial favors for his brother, such as depositing checks made out to other people, and maintaining that he had no reason to be suspicious of his brother's requests once he received what he considered adequate explanations. Twine's story was not, however, supported

by other witnesses. It is more likely that the jury simply did not believe Twine's testimony than that they believed him and mistakenly thought this was sufficient to convict him of aiding and abetting.

### IV. Request for Booker Remand

George and Twine also appeal their respective sentences, and the government agrees that the defendants should be resentenced in light of *Booker*. Because neither defendant raised his current objections at the time of sentencing, this court reviews each sentence for plain error. *Booker*, 543 U.S. at 268. A district court commits plain error by treating the Sentencing Guidelines as mandatory in determining a defendant's sentence. *United States v. Barnett*, 398 F.3d 516, 527 (6th Cir. 2005).

Both George and Twine received sentences that included imprisonment, supervised release, a special assessment, and restitution. *Booker* does not apply to restitution orders, *United States v. Sosebee*, 419 F.3d 451, 461-62 (6th Cir. 2005), and thus the defendants are not entitled to recalculation of that portion of their respective sentences. Special assessments, like restitution, are mandated by federal statute, *see* 18 U.S.C. § 3013, and therefore the defendants' special assessments likewise are unaffected by *Booker*.

The defendants' sentences of supervised release were calculated under the then-mandatory Sentencing Guidelines and are governed by *Booker*. *See* U.S. Sentencing Guidelines Manual § 5D1.1(a) (2004) (mandating imposition of term of supervised release to follow any sentence of imprisonment of more than one year). Both George and Twine are entitled to recalculation of the length of their terms of supervised release, irrespective of whether they have completed their terms of imprisonment. *See United States v. Stewart*, 433 F.3d 273, 280-81 (2d Cir. 2006) (remanding for recalculation of term of supervised release where sentence of imprisonment was complete).

The defendants' sentences of imprisonment, however, present a rare *Booker* issue in that one of the defendants, George, has already completed his prison sentence, and the other, Twine, may very likely complete his sentence before this court's mandate issues.[2] We therefore must address whether the length of the defendants' sentences would continue to present a live case or controversy after those sentences are complete. "We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

When an individual with a criminal conviction seeks to challenge his conviction in federal court after he has already completed his prison term, he is generally required to demonstrate some collateral legal consequences arising from the conviction in order to satisfy Article III jurisdictional requirements. This formal requirement has given way to a practical presumption that a criminal conviction *will* carry collateral legal consequences, because of the limitations in employment, voting, jury service, firearm possession, and the like which our society often places on individuals with a criminal history. *Spencer*, 523 U.S. at 8, 12. Although recognizing that collateral consequences are now often assumed for those challenging the underlying conviction itself, the Supreme Court has declined to extend this assumption into other contexts, such as when a released prisoner challenges the revocation of his parole, and has instead required petitioners to demonstrate a concrete injury in fact. *Spencer*, 523 U.S. at 12-14; *Lane v. Williams*, 455 U.S. 624 (1982).

---

[2] Twine's counsel represents to the court that Twine will complete his prison term on March 31, 2006. Although we find it curious that Twine continues to pursue his *Booker* claim when so little time remains on his original sentence, Twine's counsel confirmed at oral argument that this appeal does in fact continue to reflect his client's wishes.

Here, the defendants seek a remand for the recalculation of the length of their sentences. We conclude that the reasoning of *Spencer* and *Lane* controls, and we will not presume that the defendants will suffer a collateral legal consequence if their completed sentences are not recalculated post-*Booker*. Rather, the defendants must show some concrete harm that will arise from the fact that longer and not shorter sentences of imprisonment appear in their respective criminal records. *See United States v. Hamdi*, 432 F.3d 115, 118 (2d Cir. 2005) (requiring alien seeking post-release resentencing to show concrete and continuing injury resulting from earlier incarceration); *United States v. Ben Zvi*, 242 F.3d 89, 99 (2d Cir. 2001) (same). The law is clear that the time the defendants have served in prison, even if it were now found to be in excess, could not be credited to their time of supervised release, *see United States v. Johnson*, 529 U.S. 53, 57 (2000), a fact which counsel does not dispute.

Counsel suggested at oral argument that a shorter prison sentence, even if only reflected on paper, could affect the defendants' future deportation proceedings and any reentry requests made at a later date. Assuming that the defendants, if deported, would seek reentry, it is not for us to speculate under what provision of U.S. immigration or asylum law they would do so. The defendants do not point to any portions of the Immigration and Nationality Act or any other law that support the argument that the length of a defendant's prior sentence controls deportation or reentry decisions. The defendants have offered no argument specific to the facts of their case regarding how an adjustment in their respective sentences would specifically influence a decision to deport them or to deny their reentry. The defendants' vague and hypothetical arguments present "a possibility rather than a certainty or even a probability," *Spencer*, 523 U.S. at 14, and we are not persuaded that

there are any collateral legal consequences to the recalculation of portions of defendants' sentences that they have already fully served.  The *Booker* challenge to George's completed prison sentence is moot.

We remand this case for a recalculation of the defendants' periods of supervised release, and, if Twine has not completed his prison sentence, for recalculation of that portion of his sentence.

### V.  Conclusion

For the foregoing reasons, we affirm each of the defendants' convictions, we vacate the defendants' sentences of supervised release and any incomplete prison sentence,  and we remand for the limited purpose of recalculating those portions of the defendants' sentences under *Booker*.