**UNITED STATES of America,**
**Appellee,**

v.

**John FREEMAN, Defendant-Appellant.**

**No. 188, Docket 26794.**

United States Court of Appeals
Second Circuit.

Argued Jan. 11, 1962.

Decided April 9, 1962.

Joseph H. Levie, New York City (Anthony F. Marra, New York City, on the brief), for defendant-appellant.

Joseph P. Hoey, U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Jerome C. Ditore, Asst. U. S. Atty., on the brief), for appellee.

Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

John Freeman appeals his conviction on 16 counts of an indictment charging offenses against the narcotic laws, 21 U. S.C. § 174 and 26 U.S.C. §§ 4704(a) and 4705(a), on five occasions from March 10 to May 7, 1959 and conspiracy to sell narcotics between November 15, 1958 and May 7, 1959, 21 U.S.C. § 174.[1] Following his conviction by a jury, Freeman was sentenced on February 19, 1960 to serve 20 years imprisonment and to pay fines totalling $16,000.[2] The appellant's three principal claims of error concern the admission of evidence of a crime allegedly unrelated to the conspiracy charged, the

court's permitting a co-conspirator to testify that she had pleaded guilty in the state court with respect to possession of narcotics which she said had been given to her by Freeman, and the trial judge's alleged refusal to permit impeachment of three narcotic agents called as witnesses for the defense. We find no error requiring reversal in the rulings of the trial court or in the conduct of the trial and we affirm the judgment.

In all, four agents of the Bureau of Narcotics, a special employee of the Bureau, a co-conspirator not on trial and a New York City police detective offered evidence of Freeman's guilt. As there is no dispute as to the sufficiency of this evidence, we need only summarize it briefly. On March 10, 1959, Agent McDonnell arranged to purchase $3,000 of heroin from Freeman. The heroin was delivered through one Richard Woodruff, who had formerly been employed by Freeman in his florist shop in Brooklyn, and Woodruff took the money to Freeman. Four days later, on March 14, Freeman gave Emma Ward a brown paper bag containing heroin for delivery in Chicago to her brother, Otis Sears. When Miss Ward arrived at LaGuardia Airport to emplane for Chicago she was arrested by a New York City detective. Freeman complains that her testimony that she pleaded guilty in the state court to possession of narcotics on this occasion was error. Miss Ward testified that she had made previous trips to Chicago for Freeman to deliver narcotics to her brother.

On March 31, Freeman, through Woodruff, sold five pieces of heroin to Agent McDonnell for $2,800, which money was delivered to Freeman at the florist shop by Woodruff.

On April 9 McDonnell dealt directly with Freeman at the florist shop and

---

1. Nine co-defendants were indicted along with Freeman. Six have pleaded guilty to various counts. Two were granted severances and apparently have not been tried. Another, Michael Monica, after being granted a severance, was convicted on the conspiracy counts; we affirmed his conviction, United States v. Monica, 295 F.2d 400 (2 Cir. 1961), cert. denied, 368

U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962).

2. Freeman had previously been convicted of violating the federal narcotics laws. He also had a federal conviction for passing counterfeit notes and a New York misdemeanor conviction for illegal possession of narcotics.

paid him $900 on account for three envelopes of heroin which he later received from Woodruff at Woodruff's apartment. McDonnell paid Freeman the balance, $350 on April 14 and $400 on April 16. McDonnell made another purchase of heroin from Freeman on April 24 for which he paid $2,200. On May 6 McDonnell arranged with Freeman to buy 120 ounces of heroin for $9,190. When the heroin was delivered on May 7 to McDonnell at 415 Washington Street, Brooklyn, by two of Freeman's messengers, John Love Freeman and Georgie Fludd, they were arrested.

Freeman took the stand and denied that he had engaged in any of the transactions and claimed that he had been "framed" by three narcotic agents, Benjamin Fitzgerald, Francis E. Waters and James P. Hunt, because he refused to assist them in securing evidence against others in the narcotics traffic.

*Evidence of alleged unconnected crime.*

Former Narcotics Agent Copeland testified that on February 5, 1959 he gave Freeman $4,800 in government funds for narcotics which were never delivered and that the money was not repaid. There was no objection to the introduction of this testimony. Copeland's testimony was to the effect that Freeman agreed to make a delivery of narcotics, including two extra pieces which Freeman owed Otis Sears of Chicago from a previous deal. The next day when Copeland asked for the return of the money Freeman told Copeland that something went wrong and he did not return the money.

There was no error in the admission of this testimony. The Jury could find that Freeman had been trafficking in narcotics at least as early as December 1958. Emma Ward testified that she had made trips to Chicago, the home of her brother Otis Sears, a co-defendant not on trial, in December 1958 and February 1959. At some time in February, when she was scheduled to make a trip, Freeman called the trip off since he had no narcotics for her to deliver; instead he called Sears to explain that his source had supplied him sugar instead of heroin. As we have noted, Ward was arrested in March at LaGuardia Airport while about to board a plane to deliver heroin to Sears in Chicago. Woodruff testified that on January 1, 1959 he discovered a packet concealed in flowers he was delivering for Freeman. When he complained to Freeman that he was not being paid to deliver "stuff," Freeman assured him that he would receive substantial payment.

■ Even though the narcotics were never delivered to him, Copeland's testimony that the narcotics which he had bought would contain two extra pieces "that were due Otie [Sears] on a previous deal" tended to show that Freeman had been engaged in a conspiracy with Ward, Sears, and possibly others to sell narcotics prior to February 5, 1959.

Copeland's testimony was also relevant to Freeman's defense of "frame-up." In his opening statement to the jury, Freeman's counsel argued that "from 1951 until the present time" Freeman "has not trafficked any narcotics" or "committed any crimes," and that he "has gone straight for the last eight years now." He added that federal agents had in August 1958 tried to force Freeman to become an informer. When he refused they threatened him with "twenty years in jail." The present trial was thus "The product of a frame-up" because Freeman "refused to become a Judas and an informer." The Copeland testimony was therefore at least limitedly admissible as tending to show that Freeman was a willing dealer in narcotics whom it would be entirely unnecessary to "frame." See United States v. Smith, 283 F.2d 760 (2 Cir. 1960).

■ In any event, no objection to Copeland's testimony was taken at the trial and accordingly this point is not available to Freeman on appeal. See United States v. Haynes, 291 F.2d 166 (2 Cir. 1961); United States v. Sansone, 231 F.2d 887 (2 Cir. 1956), certiorari denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500.

*Emma Ward's testimony about her state plea of guilty.*

The government called as a witness Emma Ward, named as a co-conspirator in the indictment. On direct examination she was asked whether she had ever been convicted of a crime. She testified that she had been convicted of "possession of narcotics pertaining to the same case," "the same case of possession of narcotics in the State." The appellant argues that because Ward's testimony was to the effect that she had been convicted of the "same crime" the jury might impute it to Freeman.

■ Of course it was proper for the government to bring out on direct examination the criminal record of its witness. United States v. Murray, 297 F.2d 812 (2 Cir. 1962). Not to have done so would surely have subjected the prosecution to criticism. The matter of informing court and jury about information of such clear relevance as the criminal record of a witness called by the prosecution is not something which is to be reserved for the pleasure and strategy of the defense. Whatever the rule may be with respect to the permissible limits for cross-examination of a witness or a defendant, see United States v. Tomaiolo, 249 F.2d 683, 687, 692–94 (2 Cir. 1957), United States v. Provoo, 215 F.2d 531, 536–37 (2 Cir. 1954), it is usually proper and desirable that the party calling a witness with a criminal record should elicit such information on direct examination.

■ There may be circumstances where, on proper request of the defense, the trial judge should limit, or even bar such testimony, or allow it only under cautionary instructions because the prejudice to the defendant of the witness' admission of crime implicating the defendant would outweigh the advantages of a full disclosure of the witness' criminal background. Here we find that there was no likelihood of prejudice.

It must have been crystal clear to the jury that Ward had pleaded guilty to the offense of possessing narcotics when she was arrested on March 14, 1959 at La-Guardia Airport on her way to Chicago to deliver to Otis Sears the paper bag containing narcotics which Freeman had given her. If Ward's testimony was to be believed at all, it was equally clear that Ward was in fact guilty of illegal possession of narcotics. We do not see how the fact that she had pleaded guilty to such an offense in the state court could have added anything one way or the other to the story which she told under oath. Obviously Freeman had not pleaded guilty to such a charge as he had denied complicity, and the jury might with perfect consistency have concluded that, although Ward was guilty of possession of narcotics, Freeman had nothing to do with that possession. See United States v. Feldman, 299 F.2d 914 (2 Cir. 1962).

*The cross-examination of the three narcotic agents.*

Freeman claims that the trial judge improperly restricted his counsel's examination of three narcotic agents whom he called to support his defense that he had been "framed." We have searched the record and cannot find any restriction of the defense's examination of these agents. It is true that the trial judge first said something about the defense not being permitted to impeach its own witnesses, but the fact is that all relevant questions which counsel put were answered and the record does not show that there were any relevant questions which counsel was prevented from putting and which were not answered.

A reading of the examination of Narcotic Agents Benjamin Fitzgerald, Francis E. Waters and James P. Hunt which appears at pages 935 to 956 of the stenographic minutes discloses that they were asked about a visit they made to Freeman's home in the early morning hours of August 27, 1958. They went there in an attempt to persuade Freeman to help them gather evidence that certain other persons were supplying heroin in the New York area. It was Freeman's claim that because he refused to assist them they then proceeded to have the

Narcotic Bureau secure false evidence against him.

After the three agents had testified, Freeman and his wife took the stand and gave their version of the August 27 visit. They testified that they were abused physically and by the use of foul language; that the agents told Freeman that if he did not play ball with them, they would "frame" him. Thus the issue of the visit and the alleged threat to "frame" Freeman was before the jury. All five persons present testified about what happened. We have found no relevant and proper questions which were not answered because of any ruling by the court or because of the court's remarks regarding impeachment of one's own witnesses. As the examination of the defendant's witnesses was not curtailed we find no support for Freeman's claim of error in this regard.

Shortly after Agent Fitzgerald had taken the stand, the trial judge cautioned counsel for the defense that he would not be permitted to impeach defense witnesses because counsel "well knows that a witness that he calls, he certifies to his honesty." The court did not doubt that counsel should be given "latitude" in examining the agent, but knew of "no case that permits counsel to call a witness, and then if he is not satisfied with the answers that witness gives, to call another witness to show that that witness was not telling the truth, which in effect impeaches him." When Freeman took the stand after the agents had testified, the judge noted that defense counsel had objected "at the wrong time" and that "the question now is are you permitted through this witness to impeach the three witnesses you just called. In the interest of justice," he concluded, "I will let you go ahead."

■ That a party may show by other witnesses or evidence that the facts were not as his witness had said is now universally accepted. See Civil v. Waterman Steamship Corp., 217 F.2d 94 (2 Cir. 1954); 3 Wigmore, Evidence § 907 (3d Ed. 1940). The trial judge did permit both Freeman and Mrs. Freeman to give their version of the events of August 27.

■ When a defendant calls government agents to the stand in an effort to establish some part of his defense he should be given every reasonable leeway in bringing out whatever may be relevant to the issues before the jury. It is pointless to require a showing, such as the trial judge indicated might be necessary, that such witnesses are hostile.

The agents were adverse parties within the meaning of Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C., which permits such witnesses to be cross-examined, asked leading questions, and generally impeached. Although there is no companion provision in the Federal Rules of Criminal Procedure, there is even more reason for permitting such a practice in criminal cases where every proper means of ascertaining the truth should be placed at the defendant's disposal.

We do not limit our repudiation of the pernicious rule against impeachment of one's witness to instances in which the witness is an "adverse party" or "hostile." The search for truth is not to be confined by any such limitation, and, as Professor Morgan has aptly said:

> "The fact is that the general prohibition, if it ever had any basis in reason, has no place in any rational system of investigation in modern society and all attempts to modify or qualify it so as to reach sensible results serves only to demonstrate its irrationality and to increase the uncertainties of litigation." I Morgan, Basic Problems of Evidence, page 64 (1954 Ed.).

See also the classic discussion by Dean Wigmore at 3 Wigmore on Evidence §§ 896–899 (3d Ed. 1940).[3]

3. See also Judge Goodrich's excellent opinion with its review of critical commentary on the rule in Johnson v. Baltimore & O. R. Co., 208 F.2d 633 (3 Cir. 1954); McCormick on Evidence §§ 38–39 (1954 Ed.); Uniform Rules of Evidence, Rule 20 (1954).

 The trial judge's comments about impeaching one's own witnesses were erroneous and ill-advised. Fortunately they caused no damage as the defendant's counsel was not actually precluded from asking any questions or pursuing any line of inquiry.

The only additional claim of error which merits attention is the claim that Freeman was prejudiced by reason of the request of the Assistant United States Attorney for the addresses of the jurors, made in the presence of the jurors after the opening statements of counsel when the following transpired:

Mr. Kreindler (Assistant United States Attorney): "Just the addresses. We have the names."

The Court: "Why do you want the addresses?"

Mr. Kreindler: "I have been requested to make lists of jurors on cases I try."

The Court: "All right. We will give you the addresses, after the case is through."

Mr. Kreindler: "This is perfectly all right."

The Court: "All right. After the case is through, I will have the Clerk give you the addresses of the jurors."

To this no objection was taken by the defense.

 While it was thoughtless and wholly unnecessary for the Assistant United States Attorney to ask for the addresses of the jurors in the presence of the jury, it is difficult to see how anyone could have supposed that there was any sinister purpose in doing so. Had defendant's counsel, himself an experienced former prosecutor, sensed any prejudice to the defendant by reason of this inquiry he would surely have made objection forthwith. Instead, no objection was made. This would seem to us to indicate that no one took the inquiry amiss. It would be absurd to grant a new trial because of such an incident when the defendant's counsel, had he really thought it harmful at the time, could have moved then for a mistrial and a new jury could

have been impanelled with little time lost as no evidence had been taken. Suffice it to add that the United States Attorney assured us on the argument that such incident will not occur again.

We express the appreciation of the court to Joseph H. Levie, Esq. who, in representing the defendant on this appeal, has discharged with credit the responsibilities of assigned counsel.

The judgment of conviction is affirmed.