**Gary MANESS, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Director, Division of Corrections, Respondent-Appellee.**

**No. 74–1538.**

United States Court of Appeals, Fifth Circuit.

April 25, 1975.

Rehearing En Banc Granted Sept. 2, 1975.

Albert G. Caruana, A.C.L.U. of Fla., Bennett H. Brummer, Asst. Public Defender, Miami, Fla., for petitioner-appellant.

J. Robert Olian, Asst. Atty. Gen., William L. Rogers, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before MORGAN and CLARK, Circuit Judges, and GORDON, District Judge.

LEWIS R. MORGAN, Circuit Judge:

Petitioner-appellant Gary Maness filed a petition for a writ of habeas corpus, attacking his conviction for manslaughter by the state of Florida. He complains solely that he was denied due process of law by the state trial court's application of the voucher rule to prevent his cross-examination of a witness called by him, and to exclude evidence impeaching that witness. Under the voucher rule, a party calling a witness "vouches" for that witness' credibility, and therefore may not attack it. We find no denial of due process in the state court's application of Florida's evidentiary rules, and we affirm the district court's denial of the petition.

I.

Maness was convicted of manslaughter in the death of his infant daughter, Misty, who died as a result of injuries which included multiple bruises and fractures of her left arm and right thigh. After an investigation, Maness was arrested for his daughter's death. He made a sworn statement that he had struck Misty twice on the afternoon before he and his wife had taken her to the hospital for treatment of the injuries from which she died four days later. He also stated that this had occurred while Linda, his wife, was on a brief shopping trip.

At trial, Maness recanted his confession, and testified that he had confessed only to keep his wife, whom he believed to be pregnant, from going to jail. He also testified that he did not know how Misty had been injured, but that he believed the injuries were self-inflicted.

The issue in this appeal revolves around the trial testimony of Linda Maness. Linda was not called as a witness for the state. Petitioner Maness therefore called her as a defense witness, and immediately sought to treat her as an adverse witness so that he could cross-examine and impeach her. The trial court ruled that she was not an adverse witness and therefore, under the Florida voucher rule, Maness could not impeach her testimony. Linda testified that she had gone shopping on the afternoon in question and returned to find the child injured. She also testified that she did not know how Misty had sustained her injuries.

Maness sought to introduce three items of evidence, all of which were excluded, in order to contradict Linda's testimony. First, he sought to introduce some letters written to him by his wife in which she allegedly stated that she knew Maness had not killed Misty, and that she had not gone to the store on the afternoon in question.[1] Second, Maness attempted to call his sister-in-law, Dana Maness, to testify that Linda had made statements to her exculpating Maness (but not inculpating herself). Third, Maness also attempted to have his mother testify as to an out-of-court statement made by Linda to her, which he hoped would cast doubt on Linda's credibility by contradicting one detail in her testimony. All of this evidence was excluded by the state trial court on the authority of the Florida voucher rule.[2]

---

1. The letters from Linda Maness which were proffered at trial were not submitted with the petition for a writ of habeas corpus filed by Maness in the district court below. The district court found that in the letters written by Linda, "she *allegedly* admitted that she was pregnant; that she knew petitioner had not done it; that she felt guilty about what she was doing to petitioner; and that she was not at the store during the afternoon of April 14, 1971." (Emphasis added.)

2. In its findings of fact, the district court stated that the exclusion of Dana Maness' testimony was based upon the hearsay rule.

## II.

Maness grounds his case for federal habeas corpus relief upon the single case of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), which held that a Mississippi trial court's rigid application of that state's voucher and hearsay evidentiary rules had resulted in a denial of due process. Maness argues that factual parallels between his case and *Chambers* demand the same result here.[3]

Chambers was convicted of murdering a policeman who was killed in the aftermath of a barroom brawl involving a sizeable crowd. After chambers' arrest, another man, Gable McDonald, made a confession to police which he later repudiated. At Chambers' trial, there was little hard evidence that Chambers had shot the officer, and part of Chambers' defense was to show that it was in fact McDonald who had committed the crime. Since the state did not call McDonald, Chambers had to call him as his own witness. He introduced McDonald's written confession, but on cross-examination by the state, McDonald repudiated it as having merely been part of a scheme initiated by one Stokes to get Chambers out of jail, whereupon they would all share in the proceeds of a lawsuit Chambers would bring against the city. Since McDonald had been called by the defense, he could not be cross-examined by Chambers' attorney under the Mississippi voucher rule, which is for all practical purposes identical to the voucher rule of Florida whose application is challenged here by Maness. Furthermore, Chambers offered three different witnesses who would have testified that McDonald had admitted that it was he, not Chambers, who shot the officer.

None of these three out-of-court confessions was allowed into evidence under the Mississippi hearsay rule which does not recognize admissions against penal interest as an exception to the hearsay exclusion. Thus the combined effect of the Mississippi hearsay and voucher rules prevented Chambers from introducing testimony which strongly implicated McDonald, rather than Chambers, as the guilty party.

Maness has argued that *Chambers* should be read as holding that the voucher rule cannot be applied in a state criminal proceeding if it operates to hamper the defendant's development or presentation of a defense theory. Maness also recognizes that the holding in *Chambers* was closely tied to the facts in that case, but asserts that there is no appreciable difference between his case and Chambers', if his interpretation of *Chambers*, stated above, is correct.

We believe, however, that the interpretation of *Chambers* offered by Maness is too broad. The Supreme Court did question the wisdom of the common law voucher rule in the context of criminal trials, particularly in the situation faced by Chambers: a witness vital to the defense yet unlikely on direct examination to give favorable defense testimony could be brought to the witness stand only by the defense's foregoing the ability to cross-examine and impeach that witness. However, the Court did not base its reversal of Chambers' conviction on a violation of his Sixth Amendment right to confront the witnesses against him. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Rather, the Court concluded that a combination of the voucher rule and the hearsay rule, as applied, "denied [Chambers] a

The briefs of both parties on appeal, however, point out that the state trial court excluded her testimony on grounds of the voucher rule. Our disposition of Maness' contentions would be the same, however, whether the exclusion was based upon voucher or hearsay; hence we find it unnecessary to determine whether the district court's finding of fact was "clearly erroneous."

**3.** Maness was convicted on October 5, 1971. *Chambers, supra*, was decided by the United States Supreme Court on February 21, 1973. The district court determined that there was no question of the retroactivity of *Chambers* because the Supreme Court stated that it was announcing no new principle of constitutional law. *Chambers, supra*, 410 U.S. at 302, 93 S.Ct. 1038. In affirming the district court's denial of habeas corpus relief to Maness, we express no view on the question of *Chambers'* retroactivity.

trial in accord with traditional and fundamental standards of due process." *Chambers, supra,* 410 U.S. at 302, 93 S.Ct. at 1049. In reaching this conclusion, the Court carefully and extensively pointed out that the hearsay statements excluded from Chambers' trial were "made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers, supra* at 300, 93 S.Ct. at 1048. The cumulative effect of the trial court's rulings rendered Chambers' defense "far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted." *Chambers, supra* at 294, 93 S.Ct. at 1045.

It is apparent from a reading of the Supreme Court's opinion that Chambers' trial was a palpable miscarriage of justice. The state court had excluded evidence that strongly pointed the finger of guilt at McDonald while the evidence against Chambers was minimal. Furthermore, McDonald's inculpation spelled Chambers' exculpation, since the state's evidence precluded the theory that more than one person was responsible for the killing. *Chambers, supra* at 297, 93 S.Ct. 1038.

We cannot read *Chambers* as broadly as Maness would have us, because the Court explicitly stated, "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedure." *Chambers, supra* at 302, 93 S.Ct. at 1049. If *Chambers* was intended to cast a pall of unconstitutionality upon all state voucher rules, it would have established a new principle of constitutional law. Likewise, if *Chambers* meant to suggest that due process is denied when the exclusion of defense evidence pursuant to long-standing rules of evidence results in a less persuasive defense, it would also have established a new principle of constitutional law.

In deciding this case on the basis of *Chambers,* we are presented with a question of degree: was Maness' defense "less persuasive" to such a degree that we must conclude that his right to a fair trial was violated? While Maness would argue that superficial factual parallels control the outcome, we believe it is necessary to closely examine the effect on his defense worked by the voucher rule's application.

The strongest point of Maness' argument is that he should have had the opportunity to subject Linda to cross-examination. *Chambers* held that an accused's Sixth Amendment right to confront witnesses "against" him is not strictly limited to the confrontation of witnesses called by the state. *Chambers, supra* at 297–98, 93 S.Ct. 1038. Chambers' inability, because of the voucher rule, to cross-examine McDonald was thus one prong of the Court's holding that Chambers had been denied due process. At Maness' trial, Linda testified that he had slapped Misty in the face on the day in question. In addition, her extrajudicial statement to Dana Maness and her letters to Maness, as well as Maness' own testimony (contrary to his sworn statement) put her present in the home during the period when Misty apparently sustained the fatal injuries. Maness' defense involved at least a veiled accusation that Linda, rather than he, inflicted the injuries. It would certainly have furthered "the integrity of the fact-finding process," *Chambers, supra* at 295, 93 S.Ct. at 1046, if Maness had been allowed to cross-examine her.

Secondly, there is the written evidence of the letters from Linda to Maness which purportedly contain material tending to exculpate Maness. Unfortunately, these letters are not part of the record on appeal and it is therefore impossible to evaluate with any assurance the possible impact they may have had on Maness' defense. We note, however, that the state trial court initially excluded these letters because of their irrelevance to Linda's testimony; it also ruled that they did not contradict Linda's testimony that she was not at home on the after-

noon in question. Such a ruling is an indication that the content of the letters, when viewed in context, was less persuasively favorable to Maness' defense than the abbreviated allegation of their contents in the habeas petition.

Thirdly, Maness points to the exclusion of the testimony of Dana Maness, to whom Linda allegedly admitted that Maness had not touched the baby, that Linda did not know what had happened and had not gone to the store during the afternoon in question. We are reluctant to attribute to this hearsay testimony from Maness' sister-in-law the same degree of trustworthiness and reliability which the Supreme Court found in the testimony of the three witnesses to whom McDonald confessed in *Chambers*. In *Chambers*, there was independent corroboration of McDonald's admission. Maness asserts that the out-of-court statements here have indicia of reliability. However, this assertion rests primarily upon the fact that Maness' testimony, his sister-in-law's proffered testimony and the letters which have not been made available to us all cross-corroborate each other.

Finally, there is the testimony of Ruth Maness, the petitioner's mother. She would have testified that Linda told her that some baby blankets found in the Maness home in the course of the police investigation had become bloodied as a result of Linda's menstrual period. This extrajudicial statement contradicts Linda's testimony that the source of the blood was the baby's cracked gum, thereby raising a question of Linda's overall credibility. Again, as with Dana Maness, we do not find in a close relative's testimony the "persuasive assurances of trustworthiness" cited by the Court in *Chambers, supra* at 302, 93 S.Ct. 1038.

The application of the voucher rule in Maness' case undoubtedly worked to his detriment. Some evidence which suggests his innocence was excluded. However, the net effect of Linda's testimony, petitioner's own testimony, the excluded letters, and the proffered testimony of Ruth and Dana Maness is that neither petitioner nor Linda knew what caused Misty's death. Petitioner offered the rather unrealistic explanation that the baby may have fallen down, gotten caught in her crib, or hit herself in the head with her bottle. This trial record, our inability to find any positive indicia of the reliability of the hearsay testimony of Ruth and Dana Maness, and the unavailability of the letters for our inspection lead us to conclude that the voucher rule's application did not deprive Maness of a trial in accord with notions of fundamental fairness embodied in the due process clause.

The common law voucher rule has occasionally been the subject of criticism by the federal judiciary. *See Chambers, supra* at 295–97, 93 S.Ct. 1038; United States v. Prince, 491 F.2d 655, 659 (5th Cir. 1974); United States v. Torres, 477 F.2d 922 (9th Cir. 1973); United States v. Freeman, 302 F.2d 347 (2d Cir. 1962). Its demise in the federal courts is at hand; Rule 607 of the recently promulgated Federal Rules of Evidence, effective July 1, 1975 provides: "The credibility of a witness may be attacked by any party, including the party calling him." Nevertheless, it is clear that state evidentiary rules need not be mirror images of evidentiary rules applied in the federal courts in order to pass constitutional muster. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). "The due process clause has always been interpreted as permitting the states wide latitude in fashioning rules of evidence and procedure." Bassett v. Smith, 464 F.2d 347, 351 (5th Cir. 1972). *Chambers* has not altered this principle; indeed, it explicitly reaffirmed "the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Chambers, supra*, 410 U.S. at 302, 93 S.Ct. at 1049. Under all the facts and circumstances, we simply cannot say that Maness was denied his right to a fair trial.

The judgment of the district court denying the petition for a writ of habeas corpus is

Affirmed.

CLARK, Circuit Judge (dissenting).

The divine plan that put the tender life of Misty Maness into the hands of her parents is both unknowable and incomprehensible. The distinction which the majority perceives between the proof wrongly excluded in Chambers v. Mississippi and that refused in the case at bar is almost as obscure to me.

The state's case against Gary Maness was predicated upon his confession. The defense was built upon its repudiation. Gary tried to show that he "took the blame" because of a concern for his wife Linda, enhanced by a belief that she was pregnant. Dana Maness, his sister-in-law, offered testimony which tended to exculpate Gary and corroborate his recantation. The missing letters from wife Linda, according to our only information as to their content, not only supported Dana's statements but also substantiated the theory of Gary's defense. Misty received fatal wounds while she was in the custody of Gary or Linda, or both of them. Gary's confession assumed sole responsibility, subject to the implausible possibility of self-injury. Linda's letters and Dana's statements tended to cast more than a reasonable doubt that Gary alone was guilty. The letters and testimony were excluded solely because of the Florida voucher rule which sanctified Linda's testimony from attack by Gary.

As I perceive the due process principle announced in *Chambers*, it commands that every material source of evidence as to what was said and done by the principal players in this domestic tragedy should be laid before the triers of fact. At a minimum, it seems to me that this case must be remanded for a determination of the authenticity and content of Linda's letters. If these were her letters and read as described, it further is my view that habeas corpus relief should be granted and Florida should be required to retry Gary in a fair proceeding which admits *all* of the facts in testing for the truth.

I respectfully dissent.