351 A.2d 580

STATE *vs.* ANTHONY CIULLA *et al.*

JANUARY 21, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J. The defendants in this appeal are Anthony Ciulla, William Barnoski, Salvatore Macarelli, and Anthony Tassone. They and two other individuals were indicted on a charge that they conspired to corrupt a group of trainers whose thoroughbred horses were running in the 1971 winter-spring meet at the Lincoln Downs Racetrack.[1] Prior to a Superior Court trial, one of the alleged conspirators died and a dismissal order was entered as to him. The jury returned guilty verdicts against Ciulla, Barnoski, Macarelli, and Tassone and a not guilty verdict in favor of a fifth defendant, an employee of the State of Rhode Island who worked at the track as an

---

[1]The essence of the charge may be found in G. L. 1956 (1969 Reenactment) §11-7-9 where the statute makes it a crime "to corrupt any owner, trainer, groom, jockey, racing official" or any person engaged in or connected in any manner with running, promoting or officiating at a horserace.

"inspector." Hereinafter we shall refer to the deceased defendant as "Red" and the state inspector as "Adolph."

The prosecution's star witness was Robert P. Byrne. Byrne is a specialist. He is, in the words of one element of those who have a nefarious interest in the so-called Sport of Kings, a "hit man." He hits thoroughbred horses with a hypodermic syringe containing a tranquilizer. The finesse and dispatch with which he performs his specialty has apparently enhanced his professional reputation with those who see nothing wrong in fixing a horserace. The narrative unfolded by Byrne in which he described the events which transpired before and after the fixing of four races on March 17 at Lincoln Downs can best be entitled as "The 1971 St. Patrick's-Day-Parlay."

Byrne told the court and jury that as a result of a series of previous telephone calls he met Barnoski in the early afternoon of March 16, 1971 near a parking lot in Cambridge, Massachusetts. They drove in Barnoski's car to a motor lodge located in Pawtucket. They had come to Rhode Island for a "play" with the horses then running at Lincoln Downs. The track is a 15-minute automobile ride from the motor lodge. Barnoski and Byrne reached their Pawtucket destination in the late afternoon and went upstairs to a room where they met Macarelli. The door to an adjoining room was open and later developments would indicate that these two rooms would be the command post for the "play" at Lincoln Downs. Beer was ordered from a downstairs bar and Macarelli told the duo to "sit tight" for a while.

Later that evening a meeting was held in the adjoining room. The participants were Byrne, Barnoski, Ciulla, Macarelli, and the deceased defendant, Red. The meeting broke up in the early morning hours of St. Patrick's Day, March 17. Byrne, Barnoski, and Macarelli returned

to the other room and went to bed. The door between the two rooms remained open.

The next morning Byrne and his two companions joined Ciulla and Red in the other room, where the call for breakfast was sounded. Once again room service did its job and the morning meal was served. At 8 a.m. there was a knock at the door. Someone opened the door and in walked Adolph, a state inspector who worked at the track. He gave Ciulla two slips of paper. On one slip appeared the names of seven trainers whose horses were to run that afternoon in either the first or second race. The second slip contained the names of five other trainers whose steeds were due to appear in either the seventh or ninth race. Each slip listed the name of the trainer, the number of the barn where he would be situated, and the expected rendezvous time. Byrne was to approach each barn and tell the person he encountered, "I am Bobby, Adolph sent me." The trainer was to hold the horse while Byrne injected 4 to 5 cubic centimeters of a tranquilizer called "acepromazine" into the neck area of the horse. Each trainer was to receive $200 for his cooperation.

Once the hit lists made their appearance, Byrne swung into action. He went to the lodge's parking area and retrieved a brown paper bag containing "syringes and needles" and some medicine from Barnoski's automobile. He returned to the upstairs suite where he and Macarelli took the bag to their sleeping quarters and proceeded to fill 10 to 12 plastic disposable syringes with the tranquilizer. They attached a hypodermic needle to each syringe. The needle was inserted through the sealed top of a bottle labeled acepromazine and 4 to 5 cubic centimeters of a "yellowish brown clear liquid" was withdrawn from the bottle into each syringe. While the syringes were being loaded, the men in the other room were discussing the day's racing program. Byrne placed the hypodermic para-

phernalia into the lining of a three-quarter-length parka that he had specially adapted for his mission.[2] He put on the parka and drove to the racetrack, reaching the stable area about 10 a.m. Within the next hour or so seven horses[3] were hit with the tranquilizer.

Midway through his visitation, Byrne encountered Barnoski and discovered that due to the hustle and bustle at the lodge someone had forgotten to give him the $1,400 in cash which was to be distributed to the seven trainers. This mixup caused little delay as Byrne moved in and about the various barns, hitting horses and paying off the trainers. By noontime he was back in the Pawtucket motor lodge and ready for a beer. Ciulla, Barnoski, Macarelli, and Red were waiting for him. He gave a report of the results of his tour of the track. He had just opened a bottle of beer when Macarelli called him into his room and handed him another eight to ten loaded hypodermic syringes plus the necessary needles and told Byrne to get back to the track. Byrne placed the paraphernalia in the pocket of his parka, and returned to the stable area, using Barnoski's car as transportation. He met another five trainers, paid them each $200 and hit six horses — one trainer was running two horses. As he reached the last barn, he saw Adolph. Adolph gave him a wink and said to the waiting trainer, "[h]ere comes the kid now."

---

[2] Byrne had cut slits in the parka's lining so that there would be a right-hand pocket and a left-hand pocket. The loaded syringes were in the right-hand pocket. The empties were in the left-hand pocket.

[3] One of the trainers on the first hit list was Michael Capone who insisted that he and not Byrne would make the injection. The injection was given and the $200 paid. Subsequently, Capone was convicted of the crime of accepting a gift which was given to him with the intent of improperly influencing a horserace, a violation of G. L. 1956 (1969 Reenactment) §11-7-10. *State* v. *Capone,* 115 R. I. 426, 349 A.2d 615 (1975). Some of the facts to which we have alluded here can also be found in the *Capone* opinion.

His part of the plan having been accomplished, Byrne returned to his colleagues in Pawtucket. It was now somewhere between 1:45 and 2 p.m. When asked how he had made out, Byrne told Ciulla, Barnoski, and Macarelli that "[e]verything is all set." Shortly after Byrne's arrival, Red entered the suite, gave the group a report on an earlier race and departed. Later, the quartet left the lodge, drove to Lincoln Downs and arrived just as the horses in the seventh race were coming into the top of the homestretch. Ciulla, while spotting the horses with his binoculars, reported that a certain horse was leading the pack. In response, disappointment was expressed by another who hoped that Sunrise Time would win because he had the "longer odds on the morning line." Sunrise Time rose to the occasion and won the race.

At the end of the seventh race, the four men left the track and drove around the surrounding area. They returned to view the ninth race. Once the race was over, they drove to the clubhouse where they picked up Red and a "little old guy" whose identity remained a mystery to Byrne even up to the time he testified. The group then proceeded to the clubhouse entrance where they were to pick up a jockey named Eddie, who was to use his horse to "block off" one of the untouched horses in the second race. When the jockey appeared at the entranceway, he was accompanied by a track security guard. Upon noticing the jockey's escort, Byrne's group moved away from the clubhouse and returned to the motor lodge command post.

Subsequently, they were joined by Tassone and the jockey. Tassone threw a bundle of money on the bed, as did Red and the "little old guy." Byrne took $400 that Barnoski had given him earlier and added it to the pot.

The payoff was about to begin.[4] However, before it could commence, certain business expenses had to be satisfied.

Some of the money went to Barnoski to pay for the two rooms. Tassone received a payment to cover the costs of his flight expenses from New Jersey and a hotel bill he incurred at the "other end." Red took a chunk for his expenses, including the $2,400 that Byrne had paid the trainers. The amount of money available for distribution after payment of these expenses was $36,000.

The $36,000 was divided into two piles on the bed, each pile containing $18,000. Red took $1,000 from each pile and gave it to Eddie the jockey. One pile was then handed to Ciulla. The other was divided between Red and Tassone. Ciulla divided his pile with Barnoski and Macarelli. This trio made a joint contribution of $2,000 to Byrne. The "play" at Lincoln having been a financial success, and the distribution accomplished, the players began to leave.

Tassone, Red, the "little old guy," and the jockey hired a cab and were driven to the airport. Byrne, now $2,000 richer, left Pawtucket in Barnoski's car and returned to Massachusetts leaving Ciulla, Macarelli, and Barnoski at the motor lodge's cocktail lounge.

Byrne emphasized that all the horses he hit were not favorites because some of the favorites were owned by trainers with whom you "cannot do business." He also stated that he did not know which were the "live" horses. His sole responsibility was "to slow" some of the injectees so that "some live horses" could win. On cross-examination he acknowledged that he had a "general" idea as to the strength of the tranquilizer he used, but immediately conceded that he did not know its "technical"

---

[4] The only defendant who did not appear at the final convocation was Adolph, the state inspector. Byrne conceded that he was in error when he told the grand jurors that Adolph was present at the payoff.

strength. There was other evidence that corroborated some facets of Byrne's testimony.

The motor lodge records indicated that rooms 302 and 304 were registered to Ciulla; room 316 to a "Mr. Kritt" and the jockey who was to block the horses in the second race; and room 318 to Red. They also showed that Ciulla paid the bills that had been incurred by Red.

Two track security guards testified. They stated that shortly after the first race Tassone filed a complaint with their office. He identified himself as a New Jersey jeweler and charged a pari-mutuel ticket seller with shortchanging him $100. After the ninth race, there was a disturbance in the jockeys' dressing rooms which made it necessary for one of the security guards to escort Eddie from the jockeys' quarters to the clubhouse where he remained with the jockey until his agent appeared. Coincidentally the guard recognized the agent as the individual who had filed the short-change complaint. The jockey and Tassone left the clubhouse area together.

The defense consisted of an effort to discredit Byrne's testimony. Several of the trainers who had allegedly shared the $2,400 appeared at trial. Each of them denied ever meeting Byrne. They insisted that their horses were not drugged on the day in question. Two veterinarians appeared as expert witnesses. The gist of their testimony was that if a horse had received an injection of 4 to 5 cubic centimeters of the tranquilizer described by Byrne, it would have been obvious to the trained eyes of the racing officials charged with the duty of keeping racing honest that someone had tampered with the horses. These experts pointed out that such a dosage would cause a drooping of the animals' eyelids, as well as transform a spirited thoroughbred into a drowsy lethargic horse with an uncoordinated gait. They also pointed out that the drug is a muscle relaxant, which would cause the penis

of the male horses injected to drop out of its sheath and be visible. Such a condition, they claimed, would be obvious to all onlookers.

One of the veterinarians worked for the track. Before the races he was stationed in the paddock to determine, by inspection, whether the horses were in proper condition to perform. If he believed that a horse could not operate at 100 percent efficiency, he could order the horse "scratched." This witness testified that he observed all of the horses allegedly injected and not one of them exhibited any of the symptoms we have just listed.

In this appeal defendants claim that the trial justice erred sixteen times during the course of the trial. While most of those contentions relate to evidentiary rulings, one concerns the charge to the jury, and another the judge's denial of a motion for a new trial. Since some of these issues are totally lacking in merit, they will not be addressed. With regard to those contentions concerning matters within the trial justice's discretion, we find no abuse of discretion. However, the alleged errors which will be considered concern: the prosecution's disclosure on direct examination of Byrne's past criminal convictions, defendants' cross-examination of Byrne, allegedly prejudicial questions asked of various defense witnesses, a portion of the jury charge, and the denial of a motion for a new trial.

Once Byrne had been sworn in as a witness, the prosecution had him admit to being incarcerated in the late 1950's and early 1960's for three convictions of breaking and entering in Massachusetts. The defense contends that it alone had the right to impeach Byrne's credibility by showing his past convictions at that point in the trial. The state responds that these revelations were not intended to impeach the testimony of its star witness, but merely an attempt, by laying its cards on the table, to

inform the jury that Byrne was never a candidate for a good conduct award.

We live in a time when litigants often have no freedom of choice in selecting the witnesses whose testimony may be the sole source of support for their cause. This is particularly true of the Attorney General, who is duty bound to prosecute the guilty and protect the innocent. If an individual, regardless of his social status, gives the law enforcement authorities what they believe to be credible evidence relating to an alleged crime, the prosecution is compelled to present this witness as part of its case.

Informing the factfinders of relevant information regarding the criminal background of a prosecution witness is not something that should be considered an exclusive prerogative of the defense. By spotlighting Byrne's conviction, the state was obviously attempting to defuse the bomb that it thought might erupt during cross-examination if the defense began to detail Byrne's past scrapes with the law. This anticipatory maneuver does not constitute impeachment. It is merely part of the "legitimate thrust and riposte of trial tactics." *Commonwealth* v. *Garrison*, 398 Pa. 47, 52, 157 A.2d 75, 77 (1959). Like the court in *Garrison*, we see no reason to nullify a prosecutor's anticipation of what defense counsel would surely bring out. Therefore, the prosecution is entitled to elicit such information simply to divest the jury of the mistaken impression that it is keeping something from it. *United States* v. *Rothman*, 463 F.2d 488, 490 (2d Cir. 1972); *United States* v. *Freeman*, 302 F.2d 347, 350 (2d Cir. 1962); *Commonwealth* v. *Garrison, supra* at 52, 157 A.2d at 77; *see also State* v. *Estlick*, 269 Ore. 75, 523 P.2d 1029 (1974). Accordingly, we find that it was quite proper for the prosecution to detail Byrne's past convictions.

Parenthetically, we note that the state's foil was shortened during its duel with the defense because Byrne, on

cross-examination, admitted to a series of additional criminal convictions which somehow had escaped the state's scrutiny.

During cross-examination, the defense was barred from asking if Byrne ever used narcotics. The trial justice ruled that the question was not relevant because the defense could not show addiction. His ruling was correct and in line with our previous holdings in which an attempt was made to capitalize on a person's use of alcoholic beverages. *State* v. *Mattatall,* 114 R. I. 568, 337 A.2d 229 (1975); *State* v. *Amaral,* 109 R. I. 379, 285 A.2d 783 (1972).

The defendants also complain that the trial justice refused to permit them to seek Byrne's "present address." Byrne at the time of defendants' trial was in protective custody and this fact, if not deduced by the jury, could have been revealed to it. His residence up until 7 months prior to his courtroom appearance was a part of the record. Byrne's lengthy criminal record had been fully revealed. He himself agreed that he was an "ex-thief."

The defense's right to obtain the present address of a witness for the prosecution has been considered previously in *State* v. *Capone,* 115 R. I. 426, 349 A.2d 615 (1975). The defense certainly has the right to place the witness in his "proper setting" so that the jury can make a proper appraisal of his testimony. However, as pointed out in *Capone,* the trial justice has the duty to protect the witness from questions that extend beyond the bounds of proper cross-examination and are merely designed to harass, annoy, or humiliate the witness. A reply or disclosure which might endanger the life of the witness or his family is an inquiry which falls within these categories. The jury in the instant case had enough evidence regarding Byrne's past and present environment to assess his testimony in the light of his back-

ground. Consequently, we believe, as in *Capone,* that the trial justice did not err when he ruled that the confidentiality of Byrne's present address could not be disturbed.

Six trainers, who allegedly had assisted Byrne during his hit mission, testified on behalf of defendants. During cross-examination each was asked if he had been indicted for accepting a bribe from Byrne on March 17. At trial defendants objected to such inquiries, contending that only evidence of a conviction could be used to impeach these witnesses.

We do not dispute the principle that only convictions, not arrests or indictments, can be used to impeach a witness's credibility. *State* v. *Milne,* 95 R. I. 315, 325, 187 A.2d 136, 141 (1962). However, there is a significant body of law which holds that evidence of an arrest or the return of an indictment may be introduced to show interest, bias or motive on the part of a witness. *United States* v. *Musgrave,* 483 F.2d 327 (5th Cir. 1973); *State* v. *Moynahan,* 164 Conn. 560, 325 A.2d 199 (1973); *People* v. *Mason,* 28 Ill.2d 396, 192 N.E.2d 835 (1963); *see* Annot., 20 A.L.R. 2d 1421 (1951). The rule's rationale rests on the proposition that an inquiry may be made about the witness's status as an arrestee or an indictee when the revelation of such an event "* * * would reasonably tend to show that [the witness's] testimony might be influenced by interest, bias or a motive to testify falsely." *People* v. *Mason, supra* at 401, 192 N.E.2d at 837.

Here, each trainer questioned by the prosecution faced an indictment which evolved from the same incident and events for which defendants were being tried. It was proper therefore that the jury be informed of the pending indictments so it could evaluate the trainers' testimony in the light of this event.

One of the defense experts was a veterinarian whose full-time practice is devoted exclusively to the treatment

of horses — 50 percent of his patients being thorough-bred racehorses. He was the first witness to describe the physical effects which the "hit" horses would show once the acepromazine began to take effect. While he was testifying, the defense asked this witness a series of questions regarding the amount of acepromazine he normally administered to horses for certain medical procedures. They hoped to show that throughout the expert's years of treating horses, he never used more than 3 cc's of acepromazine and when he did the drug rendered the horse completely unconscious, so that it could be transported by air freight. The trial justice refused to allow the expert to testify in this vein, citing its immateriality.

The defense claims that this refusal was an improper restriction of the presentation of competent material evidence which would show the absurdity of Byrne's testimony regarding the quantity of the drug contained in each of his twelve hits. We do not agree.

The defense's contention overlooks two facts. First, prior to an attempt to show the ludicrousness of Byrne's version of the strength of his hits, it was evident that questions regarding the manifestations of the drug's presence would have to be specifically premised upon the weight and size of the injectee. When this witness first described the symptoms of drooping eyelids, drowsiness and penial gland exposure, his testimony was based on the assumption that the horses to which he had referred were similar in weight and size to those which had been visited and administered to by Byrne. Second, the problem with the inquiries under review is that one cannot tell from the record whether the expert was referring to the 50 percent of his practice which was comprised of such equines as draft, quarter and show horses or to those thoroughbred patients in the remaining 50 percent whose physical characteristics were similar to those of the 13

horses that were hit. In view of these two factors, the trial justice was correct in rejecting the offer of proof and barring any further inquiry in this area.

We likewise find nothing objectionable when the prosecution was permitted to ask the Lincoln Downs' veterinarian whether acepromazine can be diluted. Putting this inquiry in proper perspective, we would note that the prosecution's expert, the chief toxicologist for the Rhode Island Department of Health, had earlier testified that acepromazine is the commercial name for a derivative of the drug phenothiazine and it can be administered as a powder or suspended in a liquid. The toxicologist described this particular derivative as being "very intricate" and not able to be given "according to any single dosage."

When the track's veterinarian was asked by the prosecutor if he ever used acepromazine in any diluted form, he replied, "I do not dilute it, we use it as it is." This answer was followed by an inquiry as to whether acepromazine could be diluted with another substance. The defense objected on the grounds that there was no evidence that the drug used by Byrne had been diluted. The trial justice ruled that this question was within the bounds of a proper cross-examination of an expert. The doctor then went on and told the jury that acepromazine could be mixed with anything and if you mix 5 cc's of acepromazine with 5 cc's of water, you would still have 5 cc's of the drug.

"Fishing" on cross-examination, while it carries a destructive potential for the questioner's line of inquiry, is not forbidden per se. *Atlantic Ref. Co.* v. *Director of Pub. Works,* 102 R. I. 696, 714, 233 A.2d 423, 433 (1967). The two veterinarians were unquestionably a major part of defendants' attack on the tale told by Byrne.

The veterinarians' testimony was premised on Byrne's assertion that he had used 4 to 5 cc's of acepromazine. They

painted a picture which, if believed by the jury, suggested that the racing officials and the thousands of fans at Lincoln Downs on this festive occasion should have easily perceived that something was drastically wrong with 12 of the thoroughbreds running that day.[5] Byrne, of course, had described the drug as being in a liquid state. He told the jury that the solution looked like a liquid vitamin that parents give their children. The experts in their testimony sought to give the jury the impression that the 4 to 5 cc's injected by Byrne packed a truly potent wallop. However, at no time was it established that the dosage with which Byrne was working was identical in strength to the dosage which the veterinarians referred to during their testimony. In fact, earlier in the trial the defense was not permitted to ask the toxicologist a question premised on the hypothetical contents of Byrne's solution because of an absence of any evidence regarding the exact composition of the solution employed by Byrne. We agree, therefore, that the dilution inquiry was proper cross-examination.

Near the end of a rather lengthy charge, the trial justice told the jurors that after they had reached a verdict they should measure it against the dictates of their collective conscience. We all know, he added, when our actions please or displease our conscience. The trial justice concluded this facet of his charge by saying that if the verdict is consistent with the jury's conscience then "this Court" and "the people" will be satisfied.

Tassone, focusing on the trial justice's reference to one's conscience, argues that the conscience should play no part

---

[5]The veterinarian whose practice was devoted to the full-time care of his private patients, when listing the symptoms that would manifest themselves in thoroughbreds that were similar to those that were hit by Byrne, qualified his answers by indicating that the symptoms he had described would be noticeable in a "great majority" of the horses that are given this drug.

in determining the issue of guilt or innocence. He also claims that the trial justice, by ordering the use of one's conscience as the final checkpoint to evaluate the correctness of the verdict, overlooked the fact that some jurors' consciences may be in better operating condition than others.

Although Tassone's observations are noteworthy, we have repeatedly stated that the charge must be examined in its entirety. Employing this broader view, we find that immediately following his reference to one's conscience, the trial justice placed this phase of his instructions in true focus by telling the jurors, in substance, to have the courage of their convictions and call the case as they saw it. He admonished the jury that if it was convinced that the state had proved defendants' guilt beyond a reasonable doubt, it should return guilty verdicts. On the other hand, the trial justice was just as explicit in telling the panel that if it was not so convinced as to the requisite degree of guilt of any or all of defendants, it should, without any hesitation, return the necessary number of "not guilty" findings.

In essence, the trial justice, by referring to the jury's conscience, merely reminded the jurors of the oath they had taken subsequent to their selection. At that time, the jurors, by their solemn oath or affirmation, indicated that they would "* * * well and truly try and true deliverance make between the state of Rhode Island and Providence Plantations and the prisoner (or, defendant) at the bar according to law and the evidence given * * *" them. General Laws 1956 (1969 Reenactment) §9-10-20. The trial justice, in language less ornate than that contained in this statutory oath, redirected their attention to their duty to render a fair and just verdict. We cannot fault his charge.

Finally, in arguing that the trial justice erred in denying defendants' motions for a new trial, Tassone refers us to the ancient astronomer Copernicus and his heliocentric theory of celestial motion. Instead of planets, Tassone places the four defendants in an orbit revolving around the sun — Adolph. He then asks: if the hub of the system falls free, how can the other four still be considered as part of a not so heavenly plan. Celestial bodies are one thing but a conspiracy is another. In *State* v. *Fontaine,* 113 R. I. 557, 558-59, 323 A.2d 571, 572 (1974), we alluded to the rule that one alleged conspirator cannot be convicted of conspiracy if all his coconspirators are acquitted or freed under circumstances that amount to an acquittal. However, the converse of this proposition is also true. If one of several alleged conspirators is acquitted, it does not follow that all the others charged with being part of the illegal plot are to be acquitted. *United States* v. *Musgrave, supra* at 333; *see also* 91 A.L.R.2d 700 (1963). It takes more than one to have a conspiracy. We will not second guess the jury's verdict. An inherent feature of the right to a common law jury trial is the jury's power to find a defendant not guilty despite overwhelming evidence of his guilt. *United States* v. *Fielding,* 148 F. Supp. 46, 56 (D.D.C. 1957). It matters not how conclusive the evidence on any essential element of the offense may appear, the constitutional guarantee of trial by a jury precludes a court from assuming that such fact has been proved. *State* v. *Smith,* 57 Mont. 563, 190 P. 107 (1920).

Byrne frankly admitted at trial that he erred before the grand jury by placing Adolph in the motor lodge command post when the cash was being distributed. Perhaps this testimony created a sufficient doubt in the jurors' minds regarding the role, if any, Adolph played on that infamous St. Patrick's Day when Byrne flitted

like a leprechaun[6] from barn to barn at Lincoln Downs. Regardless of the jurors' motives in acquitting Adolph, we find that there was sufficient evidence that Ciulla, Barnoski, Macarelli, and Tassone were acting in concert to corrupt 11 trainers whose horses were running at Lincoln Downs on March 17, 1971.

The defendants' appeals are denied and dismissed.

Mr. Chief Justice Roberts participated in the decision but retired prior to its announcement.

*Julius C. Michaelson,* Attorney General, *Judith Romney Wegner,* Special Asst. Attorney General, for plaintiff.

*Bevilacqua & Cicilline, Martin Leppo,* Boston, Mass., *Joseph A. Capineri,* for defendants.

---

[6]Our reference to Irish folklore is in keeping with the sentiments expressed by the racetrack on the day in question. One of the exihibits is the program for March 17, 1971, which was sold to the track patrons. It cost 25 cents and was printed in green ink. The program is liberally decorated with shamrocks, harps, and attractive samples of Hibernian heraldry. As an extra added attraction, each of the races was suitably named. The first race was called "The Wearing of the Green," and the second was entitled "The Blarney Stone." The seventh race bears the label "The Faugh A Ballagh," while the ninth race was a tribute to "The Auld Sod."